## GEORGE SCHWARTZ
### v.
## LORA A. SCHWARTZ.

*Husband and Wife — Separate Maintenance — Seduction — Breach of Promise of Marriage — Duress—Instructions — Ratification — Issues of fact.*

1. Upon a bill for separate maintenance and a cross-bill to have the alleged marriage declared fraudulent and void, it is *held:* that the evidence failed to establish duress of imprisonment; that after the marriage the defendant ratified and approved his act; and that the allowance to the complainant of $300 per year for the support of herself and child is not excessive.

2. To sustain the defense of duress of imprisonment it must appear that the defendant's action was influenced by the restraint. The question whether he was coerced or acted willingly is one of fact, and the conclusion of coercion from the fact of unlawful restraint is not a necessary and unavoidable one.

3. The validity of a marriage entered into after the arrest, illegal or otherwise, of a person accused of seduction under promise of marriage, is not affected by such arrest so far as the wife is concerned, she being ignorant thereof.

[Opinion filed January 10, 1889.]

In error to the Circuit Court of Jackson County; the Hon. Richard S. Tuthill, Judge, presiding.

Defendant in error filed her bill for separate maintenance and other relief against plaintiff in error, in the court below. An answer denying the material allegations in the bill was filed by him, and also a cross-bill against defendant in error, which she answered, denying the material allegations therein. Issues were made up, among others an issue of fact, which was submitted to a jury. A hearing was had on the pleadings, proof and verdict of the jury, and the court entered a decree for defendant in error, on her bill against plaintiff in error, granting the relief prayed for, and dismissed his cross-bill, and this writ of error was sued out by him to reverse said decree. · In substance it is alleged in the bill of defendant in error that she was lawfully married to plaintiff in error on June 19, 1886, at Anaconda, Montana, in accordance with, and in consummation of an engagement contracted more than a year before between them; that upon the faith of his promise to marry her, he had before said marriage seduced her, and at that time she was pregnant, and he then and before the marriage knew that fact, and expressed himself as well satisfied with his marriage to complainant and freely and voluntarily returned with her and her father to their common residence in Carbondale, arriving there June 24, 1886, being both received and welcomed by the parents and relations of complainant, and on the day following their arrival she gave birth to a male child begotten by defendant, George Schwartz, previous to their marriage; that he, by the influence of his mother and brother, left and abandoned her in her travail, and departed from her, and left her without means of her own for the support of herself or their child, and she is living separate and apart from her said husband without her fault, and he has failed to provide or furnish her with any means; that he owns real estate in Jackson county, Illinois, and bonds and other securities in amount

about $3,000. The bill prays for separate maintenance, etc. The answer of plaintiff in error denies that he was ever legally married to complainant, or was engaged to or agreed to marry her, or seduced her as alleged; alleges if she was with child, he is not the father; denies he expressed himself as well satisfied with her, or that he freely and voluntarily returned with them to their common residence; denies he was induced to leave her by the influence of his mother and brother; denies he is under any legal obligation to live with, or provide for complainant; admits he is possessed of the real estate as alleged, denies he owns $3,000 in bonds or other securities, etc. To this answer complainant filed general replication. After formal allegations the cross-bill alleges substantially, that Lora A. Schwartz is not the wife of complainant, nor was he legally married to her, but said marriage was procured by fraud and circumvention, compulsion and duress, and was entered into against his will and without his consent; that on the 19th of June, 1886, he was arrested by one Hatton, in Anaconda, Montana; that said officer said he would take him before another officer to give bail but instead took him to the hotel, and into the presence of defendant, her father, officer Fitzpatrick and one Melvin, and that, still being under arrest, the father of defendant demanded that he marry his daughter or go to jail; that being intimidated and under arrest he had to submit to said demand, and said Fitzpatrick pretended to or did perform the marriage ceremony. By amendment to said cross-bill, it is alleged said arrest was procured by complainant, and her father acting as her agent, and upon void process, and for the express purposes of compelling complainant to marry defendant; that said writ was not a bastardy warrant, as he was informed by said officers, but a writ from Illinois to arrest him as a fugitive from justice; that after the pretended marriage ceremony the father compelled complainant to return with him and defendant to Illinois; that the next day after they returned he got away and went back to Montana; that at said time of pretended marriage complainant was deprived of his liberty, and was not in a condition to voluntarily assent to said marriage vow, but to keep out of prison and avoid the indig-

nity and threats of imprisonment of said father, and officers in his employ, was forced to go through the forms of said ceremony, etc. Prays said supposed marriage be declared fraudulent and void, etc. To this cross-bill defendant filed answer denying the fraud or compulsion alleged, and alleging said marriage was voluntary, etc. The complainant filed general replication. The following issues of fact at the request of plaintiff in error were submitted to the jury by the court:

1st. Whether or not the complainant, Lora A. Schwartz, was at the commencement of this suit the wife of George Schwartz.

2d. Whether or not there was duress in procuring the performance of the marriage ceremony alleged by complainant.

The jury by their verdict found that Lora A. Schwartz was at the commencement of the suit the wife of George Schwartz, and that there was no duress in procuring the performance of the marriage ceremony alleged by complainant.

Messrs. HILL & MARTIN and R. J. McElvain, for plaintiff in error.

Messrs. GEO. W. SMITH and JOHN HERBERT, for defendant in error.

GREEN, P. J. The allegations in the original bill that there was an engagement to marry existing in 1885 between complainant and defendant, George Schwartz—that he had carnal intercourse with her, and that she had a child begotten by him—are sufficiently shown, we think, by the evidence. He denies the engagement to marry, but the testimony of complainant that he did promise to marry her and touching his conduct toward her, the testimony of her father, showing the conduct and apparent mutual affection existing between the parties for so long a time, and the letter of defendant to complainant dated Elkville, Illinois, December 2, 1885, beginning " My dear little intended," overcome his denial. He does not in his testimony deny having had sexual intercourse with com-

plainant, but denies he seduced her under promise of mar-
riage, and testified that from what she told him, and from
what he knew, she was given to sexual intercourse many
months before the time she said he seduced her under promise
of marriage; that she kept company with other boys before
the time he left, in April, 1886. He does not testify the child
of which complainant was delivered was not his child, or was
not begotten by him. She testified it was his child, that he
was the father of it, and that she had carnal intercourse with
no person other than George Schwartz, and that he seduced
her under a promise of marriage. Waiving the question
whether her seduction was so accomplished, or resulted from
the solicitation of her lover unaided by the inducement that
if she yielded to his importunity he would marry her, we have
no doubt, from the whole evidence, that on the 14th day of
June, 1886, when complainant and her father left Carbondale
in search of defendant, the latter was under engagement with
her to marry her; that she was then pregnant with child begot-
ten by defendant; that up to that time she believed he would
return from his trip to California and marry her, as he had
promised to do; but learning, through her father, that a com-
panion of defendant, who accompanied him to California, had
returned and reported defendant had stopped off and declined
to return, she determined to go to Anaconda, at which place
she had reason to believe defendant was visiting his cousin,
and believing when she met defendant there he would fulfill
his promise and marry her, and the father, learning from her
this intention, offered to accompany her.

The defense of duress is supported solely by the testimony of
the defendant, George Schwartz, whose deposition was read
in evidence and who was not subjected to cross-examination.
He testifies that on June 19, 1886, at Anaconda, Montana, an
officer named Hatton came to his room where he was lying
on a bed, near noon, shook him, asked if his name was
Schwartz, being told it was, showed a picture, and asked: "Is
that your picture?" and being told it was, Hatton then arrested
him, pretending to read from a paper purporting to be a war-
rant from Illinois for the arrest of Schwartz as a fugitive from

justice from Illinois, for seduction; then took Schwartz through the public streets and to the hotel, saying: "The judge is up-stairs; we will go up and see if he won't give you bail;" that Hatton took him upstairs to a room where Lora, her father, Fitzpatrick, and Melvin were; that he was scared, fearing he would be put in jail; and Walker, taking him by the hand with fierceness, asked: "Are you ready to fulfill your promise to Lora?" He was overcome by the surprise, fright and fear, and being under arrest, presumes he said yes; could not help himself; was bound to do what he did. Something was done there—had no realization of marriage ceremony; did not will-ingly submit to any; all he submitted to was from scare and fear that Walker would do violence to him; that he did not know Lora and her father were in Anaconda until he met them there; that after the men left the room, Walker proposed to get ready and start home, but he said he did not want to go and did not have money to go. Walker told him to get his trunk and be at the depot for after-noon train; he had no way to escape and took his trunk to depot. Walker bought ticket, got trunk checked and kept check; that he went to Carbondale because he could see no way to get around what Walker ordered him to do, and as soon as he got to Carbondale and got his liberty he left on first chance, next day, and came back to Anaconda; that he did not tell Walker he would have married Lora before he left home if it had not been for his folks; that there was no arrange-ment made between him and Lora to be married on the day after he left Carbondale first time, and he did not tell Walker he was glad they were coming, and that he could have gotten away if he had wanted to.

Complainant and her father by their testimony contradict Schwartz in the most important and essential particulars. Her marriage certificate was properly admitted in evidence, and showed that M. J. Fitzpatrick, a justice of the peace of Deer Lodge county, Territory of Montana, did on June 19, 1886, join in lawful wedlock George Schwartz and Lora A. Walker with their mutual consent, in the presence of Frank Hatton and H. S. Melvin, witnesses, and on it is indorsed:

"Filed for record, June 21, 1886, at 2 o'clock P. M. W. F. Shanly, County Recorder;" also recorder's certificate of filing and recording same. The complainant, as to the marriage and circumstances connected with it, testified she was married to Schwartz at Anaconda on the date, by the justice, and in presence of the witnesses as shown by her marriage certificate; that after the marriage Schwartz returned to Carbondale with her and her father to her home, remained until next morning, then visited his mother and returned; then, at four o'clock P. M., again left and did not again return. That her husband after the marriage expressed himself perfectly satisfied and said he had intended to come home the last of the month and live with her, and while on their way home treated her as well as any one could, and did everything to make her comfortable.

On cross-examination she testified, she and her father arrived at Anaconda about 10 A. M. and left 4 P. M.; that defendant did not send for her to meet him there; went at her own instance; that her father employed Fitzpatrick to perform the ceremony before they had seen defendant there, and she knew defendant was at Anaconda, because he had told her he intended to visit his cousin Jeff there, and knew he would marry her if he was there; were married in hotel parlor; met Frank Hatton at depot; came with herself and father to hotel; don't know what official position Hatton had, if any; he stayed at hotel only a short time; don't know where he went; he did not say; understood from father he was going to get defendant to come and see her; did not know he took any papers for defendant's arrest; it was about half past 11 A. M. when first met Fitzpatrick; father introduced him because he wanted him to perform the ceremoney; did not know at that time, any ceremony would be performed. Knew if defendant was there he would marry her because he had told her so; he did not tell her to come out there and he would marry her; knew they could not be married without a magistrate; was not informed Hatton was a constable or marshal out there; he was employed by self and father to see if defendant was in Anaconda; saw Judge Melvin at hotel about 11 A. M.; he was

to be one of the witnesses; did not know for what purpose her father sent for him; Hatton went for him. "Knew if George was there he would marry me because he said he would, and I consider him a man of his word." That she and her father started for Anaconda, June 14th; did not tell any one where they were going. George told her before he started on his trip, he was going to California and intended to visit his cousin Jeff before he came back to Carbondale.

Simeon Walker, father of complainant, on same points as complainant, testified, she and defendant were married in the hotel parlor at Anaconda, June 19, 1886, by Fitzpatrick, in presence of Hatton, Judge Melvin and himself, and about four hours after the marriage he started with Lora and her husband for Carbondale and arrived at his home there June 25th; that after the marriage defendant said he had always intended to marry Lora and was well satisfied, and would have married her before he left had it not been for his folks, and said many other things and apologized so and began to say he was sorry he went away, and witness stopped him and said: "George, all this is past and gone; you are now husband and wife; better never refer to the matter any more;" that he told George it would be better for them to go back home, settle down and outlive the past. George thought it better for them to stay out there and asked Lora what she thought. She thought they had better go home and he said, all right. This occurred in the parlor about half an hour after their marriage; defendant made no other objection against going to Carbondale. On the way home expressed himself to witness as entirely satisfied and felt better than he had since he left home. On arriving at witness' home, George and wife were received and treated kindly and cordially. On the way home, and until the next day after he had visited his mother, defendant treated his wife most affectionately. That after witness had been informed of Lora's admission to her mother of her condition, he waited until he learned from Purdy, who went with defendant and had returned from California, that George had not returned, and upon consultation with friends, took Lora and went in search of him, and found him at Anaconda; did this for the

purpose of having him redeem his pledge of marriage with her; had him brought in presence of Lora and asked him: "George, are you ready to redeem your pledge of marriage with Lora?" He answered, "I am," and the justice proceeded to solemnize the rite of matrimony between them.

On cross-examination testified: The party George went with returned Sunday; that evening made up my mind to go; started Tuesday; did this on the basis of the duty of a father to protect his daughter. Purdy told me George started home with him, and at Ogden said he would stop there; had intended to go on home, but had got in a scrape at Carbondale and made up his mind not to go; that then, being told he ought to go home and do as he had promised, said he knew he ought, but could not very well under the circumstances; had reason to believe George was in Anaconda because his cousin lived there and had written from there to Lora, and defendant had told her he was going there, and told Purdy also. Lora believed all the time George would come back, but the circumstances led me to believe he would not, although he told us, after they were married, he intended to come back before his ticket ran out; told me after we got to Anaconda he received telegram the day or day after we started, to look out, the old man and his daughter were coming, and had plenty of time to get away if he wanted to, but was glad we were coming. On arriving at Anaconda the conductor got us into ladies' parlor, at depot, and sent Hatton in. I told him to get us into hotel without being seen, and then to get me the best lawyer there. He brought Judge Melvin, to whom I stated our case, and asked what course I should pursue; he advised me, and I acted on his advice; did not want to be seen because circumstances led me to believe defendant might possibly get away; did not believe he would; got officer on my arrival that I might do all I did legally; thought he would more readily know and find the best lawyer. Judge Melvin sent for Esquire Fitzpatrick. I made complaint charging defendant with breach of promise and seduction before Fitzpatrick; got out paper for defendant—warrant—about an hour after we came to hotel. Hatton left

Schwartz v. Schwartz.

hotel; don't know where he went; in half an hour returned with George; while Hatton was absent I requested Fitzpatrick to remain for the purpose of performing the marriage ceremony, and Melvin also as a witness to it; paid Fitzpatrick $10, Hatton $15, Melvin $25, for their services. About one o'clock the day after we got home George told me he had seen and conversed with his mother.

On re-direct, and afterward on rebuttal, witness testified: About half an hour after Purdy told me George did not intend to return I told Lora; she declared her intention of going to him, and I then told her I would take her to him. On his arrival at the hotel George was received in the kindliest manner, first by myself and then by Lora. I met him at the door, took him by the hand and spoke very kindly to him, after which Lora met him, shook hands with him and spoke very kindly to him. I then said, " George, are you ready to redeem your promise of marriage with Lora? " He answered, " I am." There were no threats, nor menaces, nor cross words passed there, or at any place; there was no demand made in any way or for anything; as a matter of fact, there was never a cross word or threat of any kind whatever made by me to George at any time or place. I asked George if he desired to go back; he said he had no money to go home on; asked him if he could not borrow money; he said he could not; I bought a ticket; my understanding was, he would pay it back when he got home. On the way home he came and sat down by me, pulled out a telegram, put his finger over the signature, and said, " look at that." It said, " George, look out, the old man is coming." After the marriage he said he wanted to go out, bring his cousin in and introduce him to his wife. I said, "certainly." He went out, brought his cousin in and introduced him to Lora as his wife, and me as her father, all on the very best of terms, and we sat there talking quite a while. On the way home George and Lora occupied the same berth in the sleeping car, and when they got home occupied the same room. I had his trunk checked with Lora's, turned round and handed him the check and said, "you can take the trunk to our house when you get home."

It thus appears from the record that up to the time defendant in error was informed by her father that George Schwartz did not intend to come back, and had not returned with his companion on the trip, she relied upon his promise to return and marry her, and had full faith in his sincerity. Then for the first time she announced her intention to go to him, and her father told her he would take her. This purpose to take her to George and protect her, was a legal and laudable purpose. She was in a condition to require a father's aid and protection during a long, sad journey. She was going among strangers, into a region strange and unfamiliar to her, thousands of miles away from her home, in a condition that would awaken sympathy in the heart of the merest stranger, and for a father to permit her to depart in this condition, alone and unattended, upon the search for her intended husband, would have been conduct almost brutal. She evidently had no purpose to coerce or force defendant into a marriage with her, and knew of no such purpose on the part of her father, either when they started or after they reached their destination, so far as this record discloses; but, as she repeatedly testified, she knew when she met George he would marry her; he had promised to do so, and she believed him.

The father, it seems, acted in good faith and under legal advice in all he did. And if the jury believed his testimony and that of his daughter in preference to Schwartz's testimony, they had ample proof upon which to base their verdict. We think the evidence falls far short of establishing the facts relied on to defeat the original bill and to sustain the cross-bill, viz., that the marriage was procured by duress, and George Schwartz became a party to it against his will and without his free consent.

In 2 Greenl. Ev., Sec. 301, it is said: "Duress, in its most enlarged sense, is defined as that degree of severity, either threatened and impending or actually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness." "The plea of duress of imprisonment is supported by any evidence that the party was unlawfully restrained of his liberty until he would execute the instrument."

In 6 Am. & Eng. Encyclopedia of Law, 57, duress is defined thus: "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of his free will."

The Supreme Court of Michigan, in Feller v. Green, 26 Mich. 69, have said: "To make out the defense of duress of imprisonment, it must appear that the party's action has been influenced by the restraint; if he has only paid or secured a just debt while held in custody, the transaction is not to be avoided unless he did so because of the custody. The question is one of fact, whether he was coerced or acted willingly, and the conclusion of coercion is not a necessary and unavoidable one from the fact of unlawful restraint." Taylor v. Cottrell, 16 Ill. 93; Ford v. Cratty, 52 Ill. 313.

We reach the same conclusions as the jury did, that the evidence failed to establish duress of imprisonment as alleged, or that threats, intimidation or fear of violence or imprisonment compelled or coerced plaintiff in error to marry defendant in error. If it be conceded Schwartz was arrested by virtue of a writ issued upon the complaint of Walker and unauthorized by the statute of Montana, yet it also appears Walker was acting in good faith in doing what he did, and was pursuing a legal remedy which he was advised to pursue by one represented to be, and by him believed to be, a competent lawyer.

It appears also by the testimony introduced on behalf of defendant in error, the only step taken under said writ was bringing Schwartz into the presence of Lora; that the father then asked him if he was ready to marry her as he had promised, and he replied, "I am," and then married her, not by reason of being under restraint or coerced thereby, but because (as the jury had the right to infer from the evidence) he saw the woman he had promised to marry, saw her condition and desired to fulfill his promise. It seems to us, even if the arrest was unlawful, but the restraint of Schwartz thereunder did not influence his action, duress of imprisonment that would suffice to invalidate the marriage, is not thereby established. It also appears by the same testimony that after

the marriage Schwartz ratified and approved his act, and never challenged its validity or denied his consent to it until his wife had filed her bill.    It is also undisputed by any evidence that defendant in error was ignorant of the fact that a writ for the arrest of Schwartz had been issued, or that he was under arrest when he consented to and did marry her.    Hence, so far as she was concerned, the validity of the marriage was not affected by such arrest.    Bates v. Ball, 72 Ill. 108.

It was not error, in view of all the evidence and the great number and very favorable instructions given for defendant, to give the jury the instructions complained of, for the complainant, and the amount awarded for the maintenance of herself and child was not too large.    The decree is affirmed.

*Decree affirmed.*