(No. 49046.-

LINDA FAY REGENOLD, Appellant, v. THE BABY FOLD, INC., *et al.*, Appellees.

*Opinion filed Sept. 20, 1977.—Rehearing denied Nov. 23, 1977.*

UNDERWOOD, J., took no part.
CLARK and MORAN, JJ., dissenting.

Craig H. Greenwood, of Bloomington, for appellant.

DePew, Grimes & Chesley (George L. Chesley and James R. DePew, of counsel), of Bloomington, for appellee The Baby Fold, Inc.

Yoder, Yoder, Luedtke & Hartweg, of Bloomington, for appellees Richard Riley and Priscilla Riley.

Thomas A. Echols, of Bloomington, guardian *ad litem*.

MR. JUSTICE RYAN delivered the opinion of the court:

Linda Fay Regenold filed a petition for a writ of *habeas corpus* in the circuit court of McLean County alleging that she was being unlawfully deprived of the custody of her infant son by the Baby Fold, Inc. Linda had executed a surrender document on October 22, 1975, pursuant to section 10 of the Adoption Act (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—10) and had physically surrendered the child to the Baby Fold. She contends that the surrender is not valid because it was executed as the result

of fraud and duress. The circuit court held the consent invalid and ordered the return of the infant. The appellate court reversed with one justice dissenting. (42 Ill. App. 3d 39.) We granted Linda's petition for leave to appeal.

It is Linda's position that the totality of the circumstances surrounding the execution of the surrender document was such that she was placed under so much stress that the execution of the document was not her free and voluntary act. She also contends that the Baby Fold participated in the fraud and duress, as will later be discussed. The Baby Fold contends that pursuant to the statute (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—11) the surrender document was irrevocable unless it was obtained by fraud or duress on the part of the Baby Fold; that the conduct of the Baby Fold did not amount to fraud or duress; that under the present statute the totality of the circumstances is not relevant, and even if relevant the total picture is not one of fraud or duress as heretofore recognized by the courts of this State.

Linda graduated from Bloomington High School in the spring of 1974. She applied for and was granted admission to Illinois State University in Normal. She did not enter the university, however, because in August 1974 she gave birth to the child who is the subject of this litigation. She had been pregnant several months before her marriage to the child's father on April 4, 1974. During this marriage she and her husband (and their son after his birth) continued to live with her mother and father and her two brothers. One brother was 18 years old and the other one was 3 years old. The 3-year-old was retarded as a result of an illness. Her husband would not work and, in June 1975, he left the home. She procured a divorce in September 1975.

Linda apparently secured employment before her husband left the home and continued to work thereafter.

Her earnings, however, were insubstantial. From these she had to pay $100 per month for a baby-sitter while she worked, and she also had to pay her mother rent. She was indebted to a doctor for the delivery of her son. She was also indebted for a hospital bill and owed an attorney for legal services related to her divorce. In addition she had a car loan and premiums to pay on her automobile insurance. She stated she had sought financial aid through different public agencies to no avail.

In September and October of 1975, she was under a doctor's care and was taking medication for an infection. The doctor told her if the medication did not remedy the ailment surgery would be required. The record does not reflect that surgery was ever performed. During this time her mother and father were having marital difficulties and were constantly arguing. Her mother told Linda that she was going to divorce Linda's father and sell the house, in which event Linda would have to move out and get a place of her own. Also, her mother was constantly reminding her that she was not paying enough rent. Her 3-year-old brother was partially crippled and, according to Linda, a little slow and "[h]e doesn't catch onto things very fast." Her brother was jealous of her son and would throw toys at him and try to knock him down. Linda also testified that during this period of time she was under considerable stress at her place of employment and was required to do the work load of about three people.

On October 20, 1975, Linda phoned the Baby Fold. According to Linda she told the person to whom she talked on the phone that she wanted someone to talk to. She was told she could come in that evening. When she arrived at the Baby Fold she talked to Martha Price, a social worker. They discussed Linda's situation for about an hour and a half, during which time Linda related all of her problems. According to Linda, the social worker then

stated that adoption could be a solution because it would relieve Linda of some of the financial obligations. Linda stated that this was the first time adoption had been mentioned. She also stated that the social worker did not mention any alternate solutions to her problems other than adoption, such as temporary foster care for the child or other sources of financial aid.

The testimony of the members of the Baby Fold staff concerning this first meeting differs somewhat from that given by Linda. Margaret Cunningham, the director of social services at the Baby Fold, testified that on October 20, 1975, at about 5 p.m., she received a phone call from Linda, who said she was interested in talking to someone about placing her child for adoption. The director invited her to come in that evening, which she did. When she arrived she was referred to Martha Price, the social worker, for the interview, during which time the social worker took notes which were subsequently expanded and have been introduced into evidence. Marcia Comeford, a student who was doing field work with the Baby Fold, was also present during the interview. Both of these staff members testified, and the expanded notes of the interview support this testimony, that following a discussion of Linda's problems Mrs. Price asked, in effect, if that was the reason she had been thinking about placing her child for adoption, and that Linda had stated it was. They also testified that there was a discussion concerning other sources of financial assistance. Linda had explored these alternatives, such as family help, financial assistance from her ex-husband, public aid, and assistance from the township. No financial aid was available from these sources. These witnesses also testified that Linda had stated that she did not want her son placed in a foster home. Mrs. Price testified that they also discussed some help for the 3-year-old brother through the local school

district, which might help remove the conflict that existed between the two infants. Several times during the interview they stated that Linda was asked if she still considered adoption as a solution and she affirmed that she did. Mrs. Price also testified that Linda said she felt that she, as a single parent, could not provide for her son what two parents could provide for a child. The witnesses stated that the adoption process was explained to her and that she was informed that if she executed a surrender it would be final and irrevocable. She was then asked to fill out a social history form, after which she was asked when she would like to bring her son and execute the surrender form. She stated that she would need a day or two to get his clothes together, and it was agreed that she would return with her son on October 22, two days later. She stated that she would like her son to have his bed because it might help him to adjust in a new environment. She asked Mrs. Price if she would have someone come and get the bed.

The next day, October 21, Mrs. Price called Linda and told her that someone from the Baby Fold could come and get the bed if she still desired to surrender her son. Linda suggested that the bed be picked up the following afternoon, October 22, and stated that she would bring her son to the Baby Fold the same evening.

Linda and her son arrived at the Baby Fold about 6 p.m. on October 22. Mrs. Price asked her how she felt about her decision to place her son for adoption, and she indicated that she wanted to continue with the plan. Marsha Ideus, another social worker at the Baby Fold, was asked to join in the interview. She described to Linda the family with which the Baby Fold had decided to place the infant. Linda stated that this made her feel better. Mrs. Price then filled in the surrender document, gave a copy of it to Linda, and read it to her and asked her if that is what

she wanted to do. Linda stated that it was, that it was her free and voluntary act, and that she understood that after signing the document she could not change her mind. She then signed the surrender document in the presence of Mrs. Price, who later signed the certificate of acknowledgment as prescribed by statute (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—10). Mrs. Price then helped Linda bring in a box of the child's clothes from Linda's car. Linda then gave Mrs. Price the infant's birth certificate and a baby picture which she said she wanted the family and her son to have. She stated she had forgotten to bring his immunization record, which she would bring later because it showed the shots that her son needed. Mrs. Price asked her to bring a copy of her divorce decree when she came.

She returned two days later, October 24, with her divorce decree and the immunization record. She and Mrs. Price discussed the placement of her son and also discussed her future plans, which included further education, better employment, and moving from her parents' home, which she was in the process of doing.

Linda testified that she felt that after the first visit to the Baby Fold on October 20, when she filled out the social history form, she had to go through with the placing of her child for adoption even though she did not sign the surrender document until two days later on October 22. Her 18-year-old brother testified that, before Linda went to the Baby Fold on October 22, he asked her why she was giving up her son and that Linda stated that she couldn't back out now.

About four days after Linda surrendered her child, she went to the home of Mr. and Mrs. Ernest Adams, from whom she often sought parental guidance. She was crying and stated that she wanted to get her baby back. Mr. and Mrs. Adams undertook to secure an attorney to represent her. Linda testified that she always conferred with Mr. and

Mrs. Adams on all major decisions; however, she had not consulted them about placing her child for adoption.

Dr. Arthur Traugott, a psychiatrist, testified on behalf of Linda. He stated hypothetically that a young woman faced with Linda's problems was subject to pressures which would impair rational judgment. Inasmuch as she did not consult with Mr. and Mrs. Adams about placing her child for adoption, as she had done in all of her other major decisions, she was not following her normal decision-making process and he did not think that her decision to surrender her child was free and voluntary. He felt that she was acting under compulsion and made an impulsive decision to rid herself of some of her burdens. He stated that the fact that the Baby Fold did not inform Linda of the various alternatives to adoption deprived her of an opportunity to make a rational decision.

The basic factual dispute is whether Linda was seeking help and advice concerning the care of her son when she made her initial visit to the Baby Fold on October 20, 1975, or whether she made the initial contact with the idea of placing her son for adoption. There is no serious conflict in the evidence concerning the other factual matters.

The trial court, in determining that the execution of the surrender was the product of duress, applied the totality of the circumstances test and found that the Baby Fold, by failing to make meaningful attempts to solve Linda's problems, by acting with "unseemly haste" in taking the surrender, and by accepting the surrender from someone subject to the assorted pressures facing Linda, became a subtle active participant in the chain of events which denied Linda the exercise of her free will and deprived her of her infant son.

Prior to 1953 it was generally held by the courts of this State that the right of a natural parent to withdraw a

consent to adoption before the entry of an adoption decree rested in the sound discretion of the court. (See 1 Ill. L. & Prac. *Adoption* sec. 21 (1953).) In 1953, the General Assembly added section 3—7 to the Adoption Act of 1945 as it then existed (Ill. Rev. Stat. 1953, ch. 4, par. 3—7), which, as we stated in *In re Simaner,* 15 Ill. 2d 568, 577, provided:

> "A consent to adoption executed and witnessed or acknowledged in accordance with the provisions of Section 3—6 of this Act shall be irrevocable unless it shall have been obtained by fraud or duress and a court of competent jurisdiction shall so find."

In *Simaner,* it was contended that the right to determine whether a consent could be withdrawn was a judicial function and that the irrevocable provision of the statute was invalid. This court held that "adoption is a question for the State, in the discharge of its duty as *parens patriae,* to regulate through its legislature as to it seems wise, hence judicial proceedings are not essential \*\*\*." (15 Ill. 2d 568, 579.) The salutory effect of the stabilizing influence of the amendment upon adoption proceedings was recognized both by this court in *People ex rel. Drury v. Catholic Home Bureau,* 34 Ill. 2d 84, and by the appellate court in *In re Wojtkowiak,* 14 Ill. App. 2d 344, and was viewed as an expression of sound public policy by the legislature.

In applying the irrevocable consent provision of the 1953 statute, the courts of this State adopted a totality of the circumstances test in determining whether in fact the consent was executed as a result of fraud or duress. (See *People ex rel. Drury v. Catholic Home Bureau; In re Huebert,* 132 Ill. App. 2d 793; *People ex rel. Buell v. Bell,* 20 Ill. App. 2d 82.) In 1973, the legislature again amended the consent provision of the Adoption Act, requiring that the fraud or duress necessary to invalidate an otherwise irrevocable consent must have been "on the part of the person before whom such consent, surrender, or other

document \*\*\* is acknowledged pursuant to the provisions of Section 10 of this Act or on the part of the adopting parents or their agents." Ill. Rev. Stat. 1973, ch. 4, par. 9.1—11.

Before considering the substantive issues involved in this appeal, it is necessary to decide the question of the quantum of proof required, which question appears never to have been resolved by this court. It has been established in other areas of the law that fraud must be proved by clear and convincing proof. (*In re Thompson,* 30 Ill. 2d 560 (attorney disciplinary proceeding); *Horney v. Hayes,* 11 Ill. 2d 178 (suit to set aside sale of beneficial interest in a land trust); *Finney v. White,* 389 Ill. 374 (suit to set aside a deed).) Also, in *Hotze v. Schlanser,* 410 Ill. 265, in defense of a suit for specific performance of a contract for a sale of real estate, the defendant contended that her signature was obtained by coercion and fraud. This court held that the evidence concerning the affirmative defense "must be clear and cogent and must leave the mind well satisfied that the allegations are true." (410 Ill. 265, 269.) In *Bernstein v. Bernstein,* 398 Ill. 52, a suit to set aside deeds alleging fraud, this court, after stating the general rule that fraud must be proved by clear and convincing proof, considered the fact that the deeds had been duly acknowledged as required by statute. The court held that to overcome the certificate of acknowledgment to a deed "clear and satisfactory proof is required." (398 Ill. 52, 54.) In 32A C.J.S. *Evidence* sec. 1023, at 664 (1964), in discussing clear and convincing evidence, the author states:

> "Instruments which have established legal rights and warrant great reliance may not be contradicted, except by this degree of proof."

In our case Linda signed a document entitled "Final and Irrevocable Surrender for Purposes of Adoption." It recites that she had read and understood the document and stated "I am signing it as my free and voluntary act."

It contains a certificate, as required by the Act, signed by Martha Price, a social worker, stating that Linda acknowledged before her that she signed it as her free and voluntary act, and that Mrs. Price had fully explained to her that by signing the surrender she irrevocably relinquished all parental right to the child and that she stated that such was her intention and desire. The certificate was duly acknowledged by Mrs. Price before a notary public in conformance with the requirements of the statute. The purpose of the formal statutory requirements in the execution of this document is to add stability and certainty to adoption proceedings. Drastic consequences and far-reaching changes stem from the execution of such a document, and substantial rights are based thereon. The legislature has not only attempted to add certainty to the adoption proceedings resulting from the execution of such a document, but the formal requirements in its execution have been tailored to insure that the surrender is the free and voluntary act of the mother and that she fully understands the importance of it and the consequences of executing it. Sound policy requires that a person should not be permitted to easily repudiate this document which complies with the formal requirements of the statute. To preserve the legislative policy a court should not set aside a consent or a surrender executed in accordance with the Adoption Act unless the one seeking to invalidate the document proves by clear and convincing evidence that its execution was procured by fraud or duress. In this case we hold that Linda has not sustained this burden of proof.

In *People ex rel. Drury v. Catholic Home Bureau,* in defining "duress" as that term is used in the Adoption Act, this court adopted the definition that had been applied in cases involving conveyances and commercial transactions and stated:

" 'Duress has been universally defined as a condition which exists where one is induced by

the unlawful act of another to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the execution of the contract or other instrument was not the voluntary act of the maker. Such compulsion must be present and operate at the time the instrument was executed. The burden of proving such duress is on the person asserting it. [Citations.]

'Mere annoyance or vexation will not constitute duress, but there must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker. [Citations.]'

Mere advice, argument or persuasion does not constitute duress or undue influence if the individual acts freely when he executed the questioned documents though the same would not have been executed except for the advice, argument or persuasion. [Citation.]" (34 Ill. 2d 84, 92-93.)

In Restatement of Contracts section 492 (1932) duress is defined as:

"(a) any wrongful act of one person that compels a manifestation of apparent assent by another to a transaction without his volition, or

(b) any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement."

The Restatement does not use the term "unlawful act" that this court used in *Drury,* but instead uses "wrongful" as the descriptive adjective. This appears to be the meaning generally applied to "unlawful" in modern cases involving duress. (See 25 Am. Jur. 2d *Duress and*

*Undue Influence* sec. 3 (1966).) Thus, acts, to be avoided, must have been induced by a wrongful act or wrongful threats. In *Kaplan v. Kaplan*, 25 Ill. 2d 181, 186, this court stated: "Any wrongful threat which actually puts the victim in such fear as to act against his will constitutes duress \*\*\*." The court then held that a wife's threat to publicize pictures taken of her husband and another woman in the other woman's apartment, by suing for alienation of affection, did not constitute duress in support of her husband's suit to set aside a property settlement. The court held that it was not duress for the wife to threaten to institute a suit to enforce what she believed to be her legal right. The court also held that the threat to publicize the pictures by other means calculated to embarrass her husband also did not constitute duress. In our case we find nothing in the entire record that would constitute duress under the accepted definition. Although Linda's personal life was subject to many unsettling influences, such as her unhappy marriage, her divorce, her quarreling mother and father, the conflict between her 3-year-old brother and her son, the pressures of her work, her financial problems, and her health, none of these factors constituted a threat of a wrongful act. The only conduct resembling a threat in this picture consists of the arguments between Linda and her mother, and the mother's statement that Linda would have to move out because she and Linda's father were going to get a divorce and that they were going to sell the house. Even if this can be construed to be a threat, it was certainly not wrongful. Linda was of legal age and was employed, and the parents were under no obligation to support her.

As to the Baby Fold, we find nothing in the record that constitutes a threat of any kind stemming from the conduct of the members of its staff, and there was no wrongful act on its part within the meaning of that term as used in Restatement of Contracts sections 492(a) and 494.

The wrongful act there described induces assent to a supposed transaction different from that to which the apparent assent is manifested, or the manifestation of assent induced by the wrongful act is in effect the physical act of another. Section 494, Comment a.

In defining fraud, this court, in *People ex rel. Chicago Bar Association v. Gilmore,* 345 Ill. 2d 28, 46, stated:

"Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture."

Although the trial court made no mention of fraud in its order and appears to have based its decision on the presence of duress in the totality of the surrounding circumstances, in this court Linda complains that the appellate court failed to consider the existence of fraud. She urges that the acceptance of the surrender from a person subject to the assorted pressures that faced her, the totality of the circumstances that prevented her from exercising her free will, the "acting with unseemly haste in taking the surrender," the presentation of adoption as the only viable solution to her problems, and the failure to make a meaningful attempt to solve her problems, all combined to bring the conduct of the Baby Fold within the *Gilmore* definition of fraud.

We view this contention as a strained effort to bring the facts of this case within the definition of *Gilmore.* In *In re Adoption of Hoffman,* 61 Ill. 2d 569, 578, this court, after quoting the definition from *Gilmore,* added " 'the concept of fraud "implies a wrongful intent—an act calculated to deceive." ' (*Exline v. Weldon* (1974), 57 Ill. 2d 105, 110.) We have also observed that 'A misrepresentation in order to constitute a fraud must consist of a

statement of material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on the truth of the statement.' *Roth v. Roth* (1970), 45 Ill. 2d 19, 23.''

Not even Linda suggests that anything the Baby Fold staff members did, or failed to do, involved a wrongful intent or was calculated to deceive, or that any action or inaction by the Baby Fold staff was for the purpose of inducing her to surrender the child. The allegation of fraud is so patently not supported by clear and convincing proof that we consider it unnecessary to further review the various conversations between Linda and the staff members.

We, as well as the appellate court, have applied the totality of the circumstances test to this case. That is, we have considered all of the facts and circumstances surrounding the execution of the surrender document to ascertain if any fraud or duress induced its execution. This is the procedure urged by Linda and is in keeping with the practice followed in applying the Act prior to the 1973 amendment. However, we can only view the 1973 amendment, which required that the fraud or duress be "on the part of the person before whom such consent, surrender, or other document *** is acknowledged *** or on the part of the adopting parents or their agents" (Ill. Rev. Stat. 1973, ch. 4, par. 9.1—11), as a repudiation by the legislature of the totality approach. It clearly is an attempt on the part of the legislature to add further stability and certainty to adoption proceedings. Linda urges that such a limitation unconstitutionally deprives a natural parent of due process and equal protection of the law, arguing that it is immaterial from what source the influence or duress stems.

We do not see that a violation of constitutional rights is involved in this case. Adoption proceedings were unknown to the common law and are solely the creation

of statutory enactment. (1 Ill. L. & Prac. *Adoption* sec. 3 (1953).) The legal status of adoption does not exist independently of statutory authority. It is therefore incumbent upon the legislature to prescribe the conditions and procedures that must be followed in creating the relationship of parent and child between persons not so related by nature. 2 Am. Jur. 2d *Adoption* sec. 2 (1962).

Also, it is well recognized that the State, as *parens patriae,* is authorized to legislate for the protection of the children within its jurisdiction. (42 Am. Jur. 2d *Infants* secs. 14, 15 (1969).) This court long ago acknowledged the right and duty of the State to legislate for the protection and welfare of its infants when it stated, in *County of McLean v. Humphreys,* 104 Ill. 378, 383:

> "It would be difficult to conceive of a class of persons that more imperatively demands the interposition of the State in their behalf than those we have just enumerated, and for whose benefit the act under consideration was adopted, and it would be a sad commentary on our State government, if it is true, as is contended, there is no constitutional power in the legislature to provide, by suitable legislation, for their education, control and protection. It is the unquestioned right and imperative duty of every enlightened government, in its character of *parens patriae,* to protect and provide for the comfort and well-being of such of its citizens as, by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves. The performance of this duty is justly regarded as one of the most important of governmental functions, and all constitutional limitations must be so understood and construed as not to interfere with its proper and legitimate exercise."

It is apparent, then, that the case we are now considering involves two areas (adoption and the welfare of children) which are peculiarly within the province of legislative action. Balanced against this area of primary State concern is the right of a parent to the custody of her child, which has been recognized as a right encompassed within the protection of the fourteenth amendment which "may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect." *Meyer v. Nebraska* 262 U.S. 390, 399-400, 67 L. Ed. 1042, 1045, 43 S. Ct. 625, 627.

It is apparent that the legislative restriction on the revocability of consent imposed by the 1973 amendment is reasonably related to the State's authority to legislate with regard to the adoption of children and for their general welfare. This court, in *People ex rel. Drury,* noted the difficulties in the pre-1953 practice when a mother had a right to revoke her consent to adoption at any time before the entry of an adoption decree, subject to the discretion of the trial judge.

However, the 1953 amendment did not fulfill the legislature's hope of removing the uncertainty surrounding the effectiveness of a consent or a surrender executed by the parent. Through judicial construction which permitted consideration of all facts and circumstances surrounding the execution of the document, a hearing on the issue of revocation following the 1953 amendment closely resembled a similar hearing prior to that amendment, and similar evidence was considered in both hearings. In effect, under this construction of the 1953 amendment, revocation of consent or surrender would be authorized on pretty much the same evidence as in pre-amendment cases. Thus, by the 1973 amendment, the legislature has again attempted to achieve the stability of adoption and the welfare of the

adopted children which this court considered within the competence of the State to effect.

To achieve this purpose the legislature has adopted the requirements that have long been applied to the remedy of rescission in other areas of the law. The general rule in contract cases holds that the validity of the contract is not affected by the fact that its execution was induced by duress practiced by a third party, where the duress was not committed with the knowledge or consent of the obligee. This general rule has been applied to suits to set aside deeds, trust deeds, mortgages, certificates of acknowledgment, compromises and settlements of claims, and assignments, as well as in suits to annul marriages or avoid the obligations of a note or a bond. (See Annot., 4 A.L.R. 864 (1919); Annot., 62 A.L.R. 1477 (1929); see also *Marston v. Brittenham,* 76 Ill. 611, 617; *Ladew v. Paine,* 82 Ill. 221; *Compton v. Bunker Hill Bank,* 96 Ill. 301; *Schwartz v. Schwartz,* 29 Ill. App. 516; *Short v. Short,* 265 Ill. App. 133; *Smith v. Saum,* 324 Ill. App. 299.) This general rule is also found in the Restatement. Restatement of Contracts secs. 492-99 (1932).

Linda, in opposing the application of the general rule, posits a hypothetical situation wherein the natural father of the child threatens to kill both the child and the mother unless she surrenders the child for adoption. Linda argues that under the general rule a consent executed under these circumstances would not be revocable. We note initially that no such extreme factual situation is present in this case and we need not decide the validity of a consent executed under these conditions. We note, however, that the general rule has been applied in other areas of the law for many years. In some States it has been applied to marriages entered into by the husband under threats of death or bodily harm from third persons. (See Annot., 16 A.L.R.2d 1430 (1951).) The courts, in the general application of this rule, have obviously been cognizant of

the rights of individuals and afforded them such protection as is required to avoid constitutional violations. We also note that the Restatement of Contracts section 494 (1932) deals with certain extreme situations wherein duress from whatever source renders the transaction void. We are confident that a court faced with the extreme situation hypothesized, in the exercise of its equity authority, will be able to protect the interests of all parties.

Ordinarily only drastic and extremely unusual circumstances will induce a natural mother to surrender her child. We recognize the circumstances Linda faced as being particularly vexing, and she was undoubtedly induced by the absolute hopelessness of the picture to surrender her child. She, as do many mothers faced with similar conditions, came to accept adoption as the only solution. At another place or time these same mothers might reject such a solution as being out of the question. In most circumstances following the surrender, the mothers will have second thoughts as to the wisdom of their decisions. Nonetheless, so many significant rights and events depend upon the certainty of the surrender that the legislature, in an expression of sound public policy, in order to add stability to adoption proceedings and to further the welfare of the children involved, has determined that the surrender should only be revocable if "it shall have been obtained by fraud or duress on the part of the person before whom such consent, surrender, or other document *** is acknowledged *** or on the part of the adopting parents or their agents" (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—11). This is peculiarly within the competence of that body, and the judiciary should not attempt to alter or abrogate that clearly expressed legislative determination.

The judgment of the appellate court, which reversed the circuit court of McLean County, is affirmed.

*Judgment affirmed.*

MR. JUSTICE UNDERWOOD took no part in the consideration or decision of this case.

CLARK and MORAN, JJ., dissenting.