184 Ill. App.3d 661 (1989)
540 N.E.2d 485
In re ADOPTION OF DANIEL KINDGREN, a Minor (Clarence Samuel et al., Petitioners-Appellants and Cross-Appellees,
v.
Kathleen J. Kindgren, Respondent-Appellee and Cross-Appellant; William E. Boylan, Guardian ad litem, Appellant and Cross-Appellee).
Nos. 2-88-0650, 2-88-1121 cons.
Illinois Appellate Court  Second District.
Opinion filed June 14, 1989.
*662 William E. Boylan, of Glen Ellyn, guardian ad litem, appellant pro se.
No brief filed for appellants Clarence Samuel and Susan Samuel.
*663 John Panegasser, of Caluwaert, Panegasser & Hancock, of Elmhurst, for appellee.
Orders affirmed.
JUSTICE INGLIS delivered the opinion of the court:
This is an appeal from two orders of the circuit court of Du Page County which (1) vacated and set aside the consent of Kathleen Kindgren to adopt her infant son, Daniel Patrick Kindgren; and (2) struck the petitions of the guardian ad litem and Clarence and Susan Samuel (adopting parents) to terminate the parental rights of Kathleen Kindgren based on unfitness. In addition, Kathleen Kindgren has filed a cross-appeal from an order which awarded attorney fees of $7,028 to the guardian ad litem. The payment of these fees was equally apportioned between Kathleen Kindgren and the adopting parents. We note that the adopting parents did file a notice of appeal on the trial court's order vacating the adoption consent. However, they did not file a brief in either appeal. These appeals have been consolidated for our review.
On appeal, the guardian ad litem contends that (1) the trial court's order vacating the adoption consent was against the manifest weight of the evidence; (2) the trial court erred in striking the petition to terminate the parental rights of Kathleen Kindgren; and (3) the court erred in striking the petition of the adopting parents to adopt the child. Kathleen Kindgren contends that the trial court improperly awarded attorney fees to the guardian ad litem or, in the alternative, improperly apportioned the payment of the fees. We affirm.
On December 11, 1986, Daniel Patrick Kindgren was born. Kathleen Kindgren testified that she considered putting her child up for adoption approximately one month before he was born. She stated that Kathryn Faydash, a friend of the adopting parents, contacted her about the possibility of adoption. Kindgren testified that Faydash obtained background information on her and told her that it would be worthwhile to put her child up for adoption. Faydash contacted Kindgren a day or two later and informed her that the adopting parents were willing to pay $5,000, plus medical expenses, if she would consent to the adoption. However, Kindgren decided not to put the child up for adoption at this time.
Kindgren further testified that in May 1987 she contacted Steven Cole, the attorney for the adopting parents, regarding the possibility of an adoption. Cole arranged for Kindgren to meet with the adopting parents on May 12, 1987. On May 11, 1987, Kindgren received a phone call from Kathryn Faydash. Faydash informed her that the *664 adopting parents were willing to double their original $5,000 offer and also stated:
"That my parents and family had no right in knowing any of this, that she knew this would happen, it was a miracle and God just wanted it to be this way so it was going to be, and that I better not change my mind."
On May 13, 1987, at approximately 9:30 a.m., the adopting parents picked up Kindgren and her child and drove to the Faydash residence. Kindgren stated that she wanted a meeting to see how her child interacted with the adopting parents. While at the Faydash home, Kindgren was informed that an appointment was set up for 1:30 p.m. at the Du Page County probation department. Kindgren was also informed that she would receive $10,000 after the adoption consent was signed. Kindgren executed the consent, returned to the Faydash residence, and received $10,000 in $20 bills.
Kathryn Faydash also testified at trial. She testified that she was a close friend of the adopting parents. She indicated that Kathleen Kindgren, a friend of a friend, contacted her in November 1986 concerning the possibility of the adoption of her child. Faydash informed Kindgren that the adopting parents were looking to adopt a child. However, Faydash denied stating that the adopting parents would make it "worthwhile" for Kindgren if she would consent to the adoption. Faydash also denied offering Kindgren $5,000 plus medical expenses if she would consent to the adoption. Instead, Faydash stated that Kindgren requested $5,000 from the adopting parents. However, the adopting parents refused to pay any money to Kindgren in exchange for her consent to the adoption. Faydash also denied telling Kindgren that the adoption was a miracle, that God wanted the adoption to occur, and that she had better not change her mind about the adoption. Faydash testified that she was later informed that Kindgren had changed her mind and had decided not to consent to the adoption.
Faydash further testified that on May 11, 1987, Kathleen Kindgren called her on the telephone and told her that she now wanted to consent to the adoption. However, she now wanted $10,000 from the adopting parents to cover her "expenses." Faydash again denied offering any money to Kindgren in exchange for her consent to the adoption. Faydash stated that the adopting parents again rejected the monetary request, but she never informed Kindgren of the rejection.
Faydash indicated that, on May 13, 1987, at approximately 10 a.m., Kathleen Kindgren arrived at her house with the child and the adopting parents. Faydash knew that arrangements had been made with the probation department, but she did not discuss these arrangements *665 with Kindgren. Faydash stated that she baby-sat for the child while Kindgren went to the probation department to sign the adoption consent. After Kindgren returned from the probation department, Faydash talked to Kindgren and prayed with her. Faydash stated that Kindgren was not confused, did not appear to be sad, and was very talkative.
Both of the adopting parents testified at trial. Each of them substantiated the testimony of Kathryn Faydash. In addition, they indicated that they had agreed to give Kathleen Kindgren $1,000 to cover her medical bills. However, neither of the adopting parents had seen any of the medical bills, nor were they aware of how the bills had been paid. Both of the adopting parents stated that they were aware that Kindgren demanded $10,000, but they decided that $1,000 was a sufficient amount. It was not until long after the adoption consent was signed, and Kindgren had left the Faydash residence, that the adopting parents became aware that Jenny, mother of adopting parent Susan, had given Kindgren an extra $9,000. It was later determined that the $10,000 had been withdrawn from a savings account bearing the names of Jenny, Susan, and Susan's brother.
Susan's mother, Jenny, also testified at trial. Jenny testified that she was aware that Kathleen Kindgren had requested $10,000 to cover her expenses and that Susan stated that she would only give her $1,000. Jenny stated that she went to the bank on May 12, 1987, and withdrew $2,500 and further withdrew $7,500 on May 13, 1987. Jenny indicated that she gave Kindgren the full $10,000 because she "had felt sorry for her and I  I loved the baby just like my kids had and I felt really sorry that she's leaving her boys [sic] behind. She was going to make up a new life and this was going to be the mother of my grandson and I wanted to give her a start and I now know I have been told that I had done wrong." Jenny denied giving the money to Kindgren in exchange for Kindgren's consent to the adoption.
Dr. Richard Abrams, a psychiatrist, also testified at trial. Dr. Abrams stated that he treated Kathleen Kindgren from January 25, 1988, to February 6, 1988, as an inpatient at the Northwest Community Hospital Psychiatric Unit. It was Dr. Abram's opinion that Kindgren lacked the requisite mental capacity to voluntarily execute an adoption consent in May 1987. Dr. Abrams indicated that Kindgren was suffering from major depression such that her thinking was sufficiently impaired to prevent her from making a rational decision. Dr. Abrams further indicated that she was unable to comprehend the nature and consequences of her decision to sign the adoption consent form.
*666 The final witness, Kimberly Crawford, a Du Page County probation department officer, testified that she handled Kathleen Kindgren's adoption consent. Crawford stated that she twice explained the consequences of signing the consent to Kindgren. Crawford also stated that she asked Kindgren if she was given or promised any money in exchange for her consent to the adoption. Kindgren responded that she did not receive any monetary compensation from the adopting parents and was not promised any money. Crawford further stated that it was her opinion that Kindgren understood the ramifications of signing the consent form.
On June 9, 1988, the trial court issued an order in which it determined that the consent was fraudulently given and, as such, must be vacated. The court found that compensation was given in exchange for Kathleen Kindgren's consent in violation of the Adoption Act (Act) (Ill. Rev. Stat. 1987, ch. 40, par. 1501 et seq.). In addition, the court determined that Daniel Patrick Kindgren must be returned to his mother, Kathleen Kindgren. The court also struck the guardian ad litem's pleadings alleging the unfitness of Kathleen Kindgren. The guardian ad litem filed a timely notice of appeal.
The trial court also conducted hearings on the guardian ad litem's petition for attorney fees. On October 28, 1988, the trial court granted the guardian ad litem's petition and apportioned the fees equally between Kathleen Kindgren and the adopting parents. Kathleen Kindgren filed a timely notice of appeal.
On appeal, the guardian first contends that Kathleen Kindgren failed to sustain her burden of proof by clear and convincing evidence that the adoption consent was procured by fraud or duress. As such, the guardian argues that the trial court's order vitiating the consent was manifestly erroneous. Kathleen Kindgren responds by arguing that the trial court's order was proper given the fact that the court affirmatively concluded that the adopting parents unlawfully paid $10,000 to obtain Kindgren's consent to the adoption.
 1, 2 Initially, we note that section 11 of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 1513) provides in pertinent part:
"A consent to adoption * * * shall be irrevocable unless it shall have been obtained by fraud or duress on the part of * * * the adopting parents or their agents and a court of competent jurisdiction shall so find." (Ill. Rev. Stat. 1987, ch. 40, par. 1513.)
It has been held that the person seeking to invalidate the consent must prove by clear and convincing evidence that the consent was executed fraudulently or while under duress. (Regenold v. Baby Fold, *667 Inc. (1977), 68 Ill.2d 419, 432; In re Nolan (1981), 94 Ill. App.3d 1081, 1086.) It is the opinion of this court that Kathleen Kindgren has sustained this burden of proof.
 3 The evidence adduced at trial indicated that Kindgren was paid $10,000 in exchange for her consent to the adoption. While it is unclear as to who actually initiated the discussions concerning the monetary compensation, it is uncontroverted that financial compensation was made. The Illinois legislature has determined that the payment of any compensation in exchange for "placing out" a child for adoption is prohibited. (Ill. Rev. Stat. 1987, ch. 40, par. 1702.) The sole exception to this prohibition is that the adopting parents may pay for the actual hospital and other medical bills associated with the birth of the child. Ill. Rev. Stat. 1987, ch. 40, par. 1704.
In the case at bar, the adopting parents determined that they should give Kathleen Kindgren $1,000 to cover the medical expenses connected with the birth of her child. However, the adopting parents never requested to see the medical bills and had no knowledge as to the actual amount of the bills. Furthermore, they were not aware that all medical expenses associated with the birth were paid for by the Illinois Department of Public Aid. Kathleen Kindgren testified that she was not aware of what the actual medical bills were because she never had to pay them.
 4 We believe that the trial court properly held that the payment of money in excess of the reasonable and actual medical expenses of the birth of the child acts to vitiate the adoption. It is the opinion of this court that a consent given in exchange for an illegal payment of money renders such consent void as against public policy. A similar decision was reached in Willey v. Lawton (1956), 8 Ill. App.2d 344. In Willey, the adopting parents paid the natural father $3,000 in cash and executed a note for $2,000, as consideration for the father's consent to the adoption. The court held that the payment of money in exchange for a consent to an adoption is contrary to public policy and therefore void. (Willey, 8 Ill. App.2d at 346-47.) In addition, we have found several decisions in other jurisdictions that have held that the unlawful payment of compensation vitiates a consent to an adoption. See Downs v. Wortman (1971), 228 Ga. 315, 185 S.E.2d 387; Gray v. Maxwell (1980), 206 Neb. 385, 293 N.W.2d 90; In re Biggs (1973), 14 Or. App. 450, 513 P.2d 1216; Gorden v. Cutler (1983), 324 Pa. Super. 61, 471 A.2d 449.
In Gray v. Maxwell (1980), 206 Neb. 385, 293 N.W.2d 90, the natural mother of a child was promised $1,500 for relinquishing her child. In addition, she was promised $1,400 to cover her medical expenses, *668 even though all of the expenses would be paid for by the Department of Public Welfare. The Nebraska Supreme Court held that the payment of money for expenses already paid for by the welfare agency constituted the "payment of a consideration for the relinquishment." (Gray, 206 Neb. at 392, 293 N.W.2d at 95.) The court noted that the payment of money in excess of the reasonable and legitimate medical expenses was in violation of the public policy of the State. (206 Neb. at 393, 293 N.W.2d at 95.) The court further held that the payment of compensation in this case acted to vitiate the relinquishment previously given. (206 Neb. at 393, 293 N.W.2d at 95.) We believe the reasoning in Gray is persuasive in the case at bar. This court cannot, in good conscience, approve of the buying or selling of any human being, let alone an infant child.
 5 In addition, we do not agree with the guardian ad litem's contention that Regenold v. Baby Fold, Inc. (1977), 68 Ill.2d 419, is persuasive in the case at bar. In Regenold, the natural mother of a child executed an adoption consent and later claimed that the consent was not valid because it was executed as a result of fraud and duress. In particular, she alleged that the consent was not a free and voluntary act due to the amount of stress that she was under. (68 Ill.2d at 424.) The trial court agreed, determining that the totality of the circumstances indicated that the consent was not voluntarily given. Specifically, the court considered that the natural mother's recent divorce, the divorce of her parents, her medical condition, and her financial difficulties were all factors which vitiated her consent. The Appellate Court for the Fourth District reversed, holding that "mere haste coupled with environmental stress does not constitute duress" as a matter of law. (Regenold v. Baby Fold, Inc. (1976), 42 Ill. App.3d 39, 44.) The supreme court affirmed the appellate court, holding that there was no fraud or duress in the execution of the consent. (68 Ill.2d at 435-36.) The court noted that the natural mother was under a great deal of stress at the time of the consent, but refused to equate stress with fraud or duress. (68 Ill.2d at 435-36.) We believe the holding in Regenold is factually distinguishable from the case at bar.
In Regenold, there was no allegation that the natural mother received any financial compensation in return for her consent to the adoption. The Regenold court simply relied on the irrevocable nature of the adoption consent, and determined that the evidence failed to indicate any fraud or duress in the execution of the consent. In the instant case, there was uncontroverted evidence of substantial monetary compensation paid to the natural mother, in violation of the public policy of this State. For this reason, we do not believe that Regenold *669 controls the disposition of the case at bar.
 6 The guardian ad litem last contends that the trial court improperly struck the guardian's petition to terminate Kathleen Kindgren's parental rights and also improperly struck the adopting parent's petition to adopt the minor child. In addition, the guardian argues that the minor child was denied an opportunity for a hearing, in violation of his due process rights. We note that a party claiming a violation of a constitutional right has a duty to raise the argument at the earliest opportunity, and the failure to do so constitutes a waiver of that right. (Inwang v. Community College District No. 508 (1983), 117 Ill. App.3d 608, 615; Feldman v. Board of Trustees (1982), 108 Ill. App.3d 1127, 1134.) The guardian failed to allege any due process violations at trial. Consequently, we deem the argument to be waived on appeal. In addition, we also believe that the trial court was well within its discretion in striking the two petitions filed or amended after the court had ruled on the consent issue.
 7 Kathleen Kindgren has also filed an appeal in this case, raising two issues. Kindgren first argues that the trial court erred in failing to find that she lacked the requisite mental capacity to knowingly give her consent to the adoption. Kindgren originally alleged that her consent should be vacated based on fraud, duress, or incapacity. The trial court held that the consent should be vacated because it was fraudulently procured and refused to make a determination concerning Kindgren's mental state at the time she executed the consent. A trial court, in a nonjury civil case, is not required to state all findings of fact in its final order. (American Wheel & Engineering Co. v. Dana Molded Products, Inc. (1985), 132 Ill. App.3d 205, 212.) We believe that the trial court properly refused to make any specific findings of fact relative to Kindgren's mental state at the time of the consent.
Kindgren also argues that the trial court improperly awarded attorney fees to the guardian ad litem or, alternatively, improperly apportioned the fees equally between her and the adopting parents. We disagree.
Initially, we note that the trial court appointed the guardian ad litem to represent the interests of the minor child. The court further granted the guardian the right to conduct formal discovery. After so doing, the guardian discovered certain improprieties which led him to believe that the adoption consent was not valid. As a result of his work, the guardian petitioned the court to approve $7,028 in attorney fees. A hearing was held, at which time all parties agreed that the fee amount was fair and reasonable. The dispute concerned authority for allowance of fees and who would have to pay the fees.
*670  8 Kathleen Kindgren is correct when she notes that the trial court did not have express statutory authority to award fees to the guardian ad litem. However, the court does have the inherent power to award fees to the guardian in a child-custody proceeding. (In re Estate of Azevedo (1983), 115 Ill. App.3d 260, 264; Zalduendo v. Zalduendo (1977), 45 Ill. App.3d 849, 858-59.) In the instant case, the appointment of the guardian was necessary to protect the interests of the minor child. Since the appointment was necessary, it was also well within the equitable powers of the trial court to ensure that the guardian received reasonable compensation.
 9, 10 We also believe that the trial court properly apportioned the fees equally between the adopting parents and Kathleen Kindgren. The trial court has broad discretion in determining the reasonableness of a guardian ad litem's petition for attorney fees, and its decision will not be disturbed on appeal absent a clear abuse of this discretion. (In re Marriage of Soraparu (1986), 147 Ill. App.3d 857, 864; Gibson v. Barton (1983), 118 Ill. App.3d 576, 582.) In this case, the trial court determined that "equitable cause exists for the apportionment of said Guardian Ad Litem fees and costs between Kathleen J. Kindgren and [the adopting parents]." The court stated that it did not consider fault or culpability of the parties in reaching its decision. We cannot say that the equal apportionment of fees was a clear abuse of discretion.
The trial court determined that $7,028 was a reasonable compensation for the guardian. The court apportioned this amount equally between Kindgren and the adopting parents, or $3,514 from each party. We do note that the order stated that each party was to pay $5,314 to the guardian. However, we believe this figure was a typographical error, especially given the fact that all parties agree that $7,028 is the correct amount of fees for the guardian.
Accordingly, for the above stated reasons, the judgment of the circuit court of Du Page County is affirmed.
Affirmed.
UNVERZAGT, P.J., and LINDBERG, J., concur.