234

*In re* DAVID BARNARD (The People of the State of Illinois *ex rel.* The Department of Mental Health *et al.*, Petitioners-Appellees, v. David V. Barnard, Respondent-Appellant).

Fifth District   No. 5—91—0689

Opinion filed July 20, 1993.

236

John B. Lower and Jeff M. Plesko, both of Guardianship & Advocacy Commission, of Anna, for appellant.

Darrell Williamson, State's Attorney, of Chester (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellees.

JUSTICE WELCH delivered the opinion of the court:

David V. Barnard (hereinafter respondent) appeals from the September 19, 1991, order of the circuit court of Randolph County, entered on jury verdict, that respondent was subject to continued involuntary admission to a mental health facility. Respondent raises the following issues on review:

> (1) whether the trial court erred in denying respondent's request made pursuant to section 3—804 of the Mental Health and Developmental Disabilities Code (Code or Mental Health Code) (Ill. Rev. Stat. 1991, ch. 91½, par. 3—804) for an independent examination by a qualified examiner not employed by the Chester Mental Health Center, to assist in the preparation of his defense, and whether respondent was denied the effective assistance of counsel due to the denial of respondent's request for an independent expert to assist in respondent's defense;

> (2) whether respondent was denied a fair trial due to the illegal seizure from respondent's room at the Chester Mental Health Center of a drawing made by respondent of a naked prepubescent female, which was introduced by the State at

trial as evidence of respondent's continued condition of pedophilia;

(3) whether respondent was denied the effective assistance of counsel due to counsel's failure to object to the introduction in evidence of the above-noted drawing; and

(4) whether the State failed to present clear and convincing evidence that respondent was subject to continued involuntary admission.

For reasons stated as follows, we affirm.

The record indicates that respondent was convicted in 1980 of sexually abusing his six-year-old stepdaughter in October 1979 and that he was involuntarily admitted to the Chester Mental Health Facility after his release from the Menard Psychiatric Center in March 1986. James Poole, an administrative assistant of the Chester Mental Health Facility, filed a petition on July 25, 1991, asserting that respondent was a patient who continued to be subject to involuntary admission to a mental health facility pursuant to section 3—813 of the Code, that respondent was mentally ill and because of his illness he was reasonably expected to inflict serious physical harm upon himself or another in the near future, and that because of his illness respondent was unable to provide for his basic physical needs so as to guard himself from serious harm. Poole also stated the bases for these assertions in his petition:

"Mr. David Barnard has remained in this facility since March of 1986. He has a history of sexual aggression toward very young females. He refuses to cooperate in treatment, insisting on presenting his own bizarre form of treatment. Mr. Barnard has remained unchanged since admission to the facility. He continues to pose a danger to others."

Certificates of Dr. M.V. Reddy, a psychiatrist, and Dr. W.C. Holz, a clinical psychologist, were attached to the petition, and each stated that respondent was diagnosed as suffering an atypical psychotic disorder and pedophilia on Axis I, a paranoid personality disorder on Axis II, and no diagnosis on Axis III. A treatment-plan review dated May 28, 1991, was also filed with the petition on July 25, 1991. The record indicates that a petition for discharge had been filed by respondent prior to the filing of the petition for involuntary admission.

On July 25, 1991, respondent filed a *pro se* request for an independent examination pursuant to section 3—804 of the Code, a motion for appointment of counsel with the provision that respondent, himself, be entitled to object and cross-examine witnesses, and a motion for discovery and bill of particulars. The record also indicates that re-

spondent filed various other pleadings, discovery papers, articles, copies of letters to a convicted killer on death row and President George Bush, and copies of pleadings filed in Federal court alleging violation of his civil rights. The record also indicates that the Federal complaint was dismissed with prejudice by the court.

The trial court appointed Richard A. Brown to represent respondent on July 29, 1991, and, following a hearing on September 13, 1991, ordered that because respondent was represented by counsel the pleadings and other papers filed by respondent should be struck, except for the motion for independent examination. The court ruled in this regard that while respondent had a statutory right to an independent examination, the fact that an examiner was employed by the Department of Mental Health (Department) did not necessarily render the examiner biased, citing *In re Pates* (1981), 99 Ill. App. 3d 847, 426 N.E.2d 275, and the court denied respondent's motion for independent examination. Counsel for respondent notified the court that he was objecting to the partiality of the examiner, pursuant to *Pates*. Counsel for respondent also moved on September 13, 1991, to voluntarily dismiss the petition for discharge and proceed to trial on the State's petition for continued involuntary admission.

The petition was called for jury trial on September 19, 1991. Daniel J. Cuneo, Ph.D., testified on behalf of the State that he is employed by the Illinois Department of Mental Health as director of research at the Chester Mental Health Center. Dr. Cuneo testified that he participates in civil commitment hearings and conducts fitness evaluations. He also reviews reports done by the Department concerning a defendant's fitness for trial or the insanity defense which are presented in court. Cuneo has been with the Department of Mental Health for 14 years and is on the board of directors of the Children First Program, which deals with divorcing parents. Cuneo also testified that he is a consultant for the Human Support Services Center in Waterloo and the Department of Rehabilitative Services for both disability and vocational rehabilitation, and that he is the "Psych." supervisor at the St. Clair County jail and Juvenile Detention Center. Dr. Cuneo is a licensed psychologist in Illinois and Missouri, has a private practice located in Belleville, Illinois, and has been qualified to testify as an expert on numerous occasions. He has testified for both the prosecution and the defense.

Dr. Cuneo admitted on cross-examination that testifying at involuntary-admission hearings is part of his duties as an employee of the Department of Mental Health, and that he was requested to examine respondent by one of the assistant managers at the Chester Mental

Health Center and to make a recommendation as to whether respondent fits the criteria for civil commitment. He insisted that this examination, evaluation, and testimony at the hearing was not done on behalf of the State's Attorney's office.

Counsel for respondent asked that the record reflect that he had no objection to the qualification of Dr. Cuneo as a clinical psychologist to testify as an expert on behalf of the State but that respondent objected to Dr. Cuneo as an independent and impartial examiner in this case. Respondent's objection was overruled. Dr. Cuneo noted on redirect that he has on occasion evaluated patients in the mental health system for whom he recommended transfer and had once recommended release from the facility. He also testified that who pays his salary has no bearing on the impartiality of his evaluations.

Dr. Cuneo testified that he is familiar with respondent and has known him since 1986 when respondent first came to the Chester Mental Health Center from the Menard Psychiatric Center. Cuneo has examined respondent numerous times since 1986 and, in his evaluations of respondent, has taken into consideration current clinical-staff notes and reports of other doctors. Dr. Cuneo noted that he has kept a correspondence file of the many threatening letters respondent has sent to various individuals.

Cuneo testified that he attempted to examine respondent on September 18, 1991, but respondent chose not to speak with him. Cuneo told respondent that he would have to review all of his records and speak with his therapist and the other people he was working with in order to complete his evaluation. Dr. Cuneo testified that from his conference with the other doctors and his review of the files, the staff notes, and the correspondence written by respondent, he was able to detect symptoms of mental illness or mental problems with respondent.

Dr. Cuneo opined that under DSM-III-R, the diagnostic and statistical manual of mental health, he would diagnose respondent with an Axis I, or primary diagnosis, of pedophilia. Dr. Cuneo explained that pedophilia is an extreme sexual attraction to young children and noted that respondent has a sexual drive toward molesting young children. Dr. Cuneo stated that there is a specific treatment program for pedophilia which involves an in-depth interview and psychological/physiological evaluation from which it can be determined whether the patient is in need of inpatient or outpatient therapy. Dr. Cuneo stated that the primary quality needed for any type of successful treatment is motivation, but he opined that respondent will not get involved in anything except for typing legal documents. While respondent is now

seeing a therapist, he does not want to deal with the issue of his sexual offenses or his borderline personality disorder and refuses any other means of treatment. Instead, respondent believes that he can treat himself by drawing pictures or clipping photographs from magazines of little girls and then masturbating to them.

Dr. Cuneo also diagnosed respondent on Axis II with a borderline personality disorder which manifests itself in intense and unstable interpersonal relationships characterized by alternating extremes of over-idealization and devaluation. He stated that this occurred with his ex-wife, whom he either loved or hated, and with his stepchild, whom he molested and whom he later stated that he wanted to train and raise and, now that she is 18 years of age, wants to marry. Cuneo also testified that respondent exhibits self-damaging impulsiveness in sexual, suicidal, and self-mutilating behaviors, that respondent has made recurrent suicidal threats or gestures at self-mutilating behavior, and that respondent has a history of suicidal attempts. Dr. Cuneo opined that respondent exhibits an affective instability in marked shifts from base line to depression and inappropriate intense exhibitions of anger or lack of control of anger. Cuneo also testified that respondent has a marked and persistent identity disturbance manifested by uncertainty of sexual identity and a confused sexual orientation, which was caused by exposure to physical and sexual abuse as a child. Dr. Cuneo testified that respondent also exhibits confusion as to goals as shown by behavior undertaken to undermine those goals. For example, respondent has voiced a desire for transfer or release from the facility but, on the date the petition was filed, sent letters with sexually explicit material concerning female children to the court and decorated the envelope of a letter, addressed to one the attorneys who is representing him, with a picture of a naked little girl.

Dr. Cuneo has also diagnosed respondent on Axis II as having a passive/aggressive personality. He stated that individuals having this personality disorder will have extreme difficulty in directly expressing anger. He stated that respondent has sent threatening letters to the Department of Children and Family Services (DCFS), judges, attorneys, and his ex-wife, and Dr. Cuneo opined that respondent has exhibited this disorder by sending those letters. He noted that respondent has also sought to adopt small children through DCFS and has exhibited other bizarre beliefs such as an ability to control events in Russia, witchcraft, and Satanism.

Dr. Cuneo testified that respondent drew a picture in June 1991 of a naked little girl and that he hung the picture in his room and would masturbate to it. Respondent has also repeatedly sought out his

stepdaughter in hopes that he can marry her and bear a child by her. In Dr. Cuneo's opinion respondent is, at this time, a person subject to involuntary admission, and Dr. Cuneo also opined that because of his mental illness respondent could reasonably be expected to inflict serious physical harm on himself or another in the near future and therefore needs a structured environment. He further explained that respondent was a danger to himself because his judgment is so impaired that he will do things to get himself hurt. Respondent has repeatedly stated that he wants to return to West Frankfort, Illinois, and impregnate the stepdaughter whom he molested when she was a child, and Dr. Cuneo feels that this may very well inflame the West Frankfort community. He recommended that respondent be committed to the Department of Mental Health for further hospitalization and stated that respondent could not be transferred or released until he has shown some indication that he is motivated and will cooperate with treatment.

On cross-examination Dr. Cuneo stated that respondent has refused all medication, and Dr. Cuneo admitted that Chester Mental Health Center does not have a specific treatment program for pedophilia. Cuneo stated, however, that respondent was not being specifically hospitalized for pedophilia but because he is a danger to both himself and others and because his behavior is such that, without any cooperation in any type of psychotherapy or medication treatment, he cannot be transferred to a less secure facility. Cuneo stated under cross-examination that Choate Medical Center was not secure enough for respondent, but he admitted that Alton State Hospital did have forensic cottages.

In response to questioning about the most recent threatening letter written by respondent, Dr. Cuneo testified about a letter which was sent in April 1991 to President Bush concerning occurrences in Russia and which stated that since 1979 God had given respondent a vast knowledge of the future and had chosen him through which to work. Cuneo admitted that the letter was not threatening but merely "loose." Dr. Cuneo did feel that a recent letter sent by respondent to a psychiatrist, stating that his stepdaughter was interested in getting married and that he wanted her to write to him, was threatening to the stepdaughter. In addition, Cuneo noted that respondent had recently sent letters to Wesley Allen Dodd, who was on death row at the Washington State Penitentiary. Dr. Cuneo read portions of one of the letters in which respondent stated that the State should honor Dodd's request to die and in which respondent stated that Dodd was a

"national hero" for having "set the system straight for what it is, especially clinical psychologists."

As another example of respondent's danger to others, Dr. Cuneo testified that respondent had recently cut an advertisement out of Newsweek magazine which showed a man without a shirt holding a naked child and which read, "what men really want." Dr. Cuneo stated that respondent had crossed out the slogan and written, "what I really want: I like blue jeans and naked female babies, healthy ones." He again noted the June 1991 drawing of the naked child to which respondent ritually masturbated.

Dr. William C. Holz, a clinical psychologist at the Chester Mental Health Center, testified that he is the coordinating therapist and treatment-team leader at the Chester Mental Health Center and has been employed at the Center since 1984. Among his duties as a psychologist, Holz administers psychological tests, performs psychological evaluations and screenings of new recipients, writes treatment plans for the treatment recipients, and testifies at involuntary-commitment hearings. Dr. Holz testified that he is familiar with respondent and that he was on the admission team when respondent first entered the hospital in 1986. Holz is currently the team leader on the unit where respondent is located. Holz testified that under the Mental Health Code each treatment recipient receives an initial treatment plan and then a full master-treatment plan as recommended by the treatment staff. The master plan is then reviewed with the recipient every 30 days where decisions are made for changes in the treatment plan. Holz is the leader of the team that meets to go over these issues.

Although Holz has previously examined respondent and is familiar with his clinical history and file, respondent refused to speak with Holz when he attempted to examine respondent prior to trial. Dr. Holz concurred with Dr. Cuneo's opinion that respondent exhibits symptoms of mental illness. Holz opined that the personality disorder is a major consideration and that this problem affects respondent's thought processes, perceptions, and judgment. Holz also concurred that respondent refuses to cooperate with treatment at the Center and noted that respondent believes that, because there is nothing wrong with him, he should be released.

Holz also agrees that respondent's recent behavior indicates the probability that he would be dangerous to himself or others if he were to be released at this time. Holz reported an incident which occurred in July 1991 in which respondent sent for some mail-order materials for which he did not pay and was asked by the staff to return them.

Respondent refused to comply, stating that this was a violation of his rights.

Dr. Holz also reported that he was informed that respondent had placed a picture on his wall of a naked girl on which he had drawn the sexual organs with very explicit detailing. Dr. Holz testified that when he went to investigate in respondent's room he saw that respondent had taped the picture in the closet behind his clothes, but Dr. Holz also saw that if the clothes were separated the picture could be viewed from respondent's bed. Holz stated that he had asked respondent about the picture and respondent had said that he wanted to bring the picture to court because it proved that Holz and Cuneo were liars. Holz stated that he did not understand respondent's comment but said that if respondent wanted to show the picture to the court he would gladly let him do this. Holz was asked if he had the drawing with him, and when Holz responded affirmatively, the State marked the drawing as People's exhibit number 1. Holz identified the exhibit as the explicit drawing of a naked little girl which he had removed from the wall in respondent's room and had placed in the property control area of the Center. There was no objection from counsel for respondent to any of the testimony concerning the drawing or to the admission of People's exhibit 1 into evidence.

Dr. Holz also noted that respondent had written a tremendous volume of letters and particularly noted a September 4, 1991, letter to the Superintendent of Parole for the Illinois Department of Corrections as indicating that respondent is still dangerous to himself or others. This letter stated, "as my last correspondence to you was on August 8, 1991, but because I never threatened to kill you or do great bodily harm to you, you disregarded by former request." Holz also related a letter sent by respondent to DCFS wherein he related a "vision" or dream he had as a child about a grape vineyard and a hand reaching out from heaven holding a glowing cluster of grapes. Respondent then stated in his letter:

> "This glowing grape is a child, a female child. There is not [sic] mother, no other child. So I have been waiting on God for what he has shown me has always come about. I am 37 years old and a child would fit into my life—my reason and purpose for living, true meaning. I would like to be able to qualify for orphan foster care."

Dr. Holz admitted that the treatment team had recommended that respondent be transferred to an open facility but that the administration had turned this recommendation down, feeling that more time was needed to determine whether respondent would remain stable.

Holz reiterated his opinion that respondent was still mentally ill and because of his mental illness could still reasonably be expected to inflict serious physical harm upon himself or another in the near future. Holz stated that from what he had read of treatment methods for pedophilia, they produce no practical results. Dr. Holz opined that patients with pedophilia change because they decide that this is what they want to do and get counseling to voluntarily change their behavior. Holz again stated that respondent has the opportunity for counseling but does not often avail himself of the opportunity because he has no interest in changing.

On cross-examination Dr. Holz admitted that he was an employee of the State of Illinois at the Chester Mental Health Center, and that he was asked by the Center's administrative assistant, Mr. Poole, to review respondent's file and make a recommendation as to whether respondent fit the criteria for commission to a mental health facility. Holz also admitted that if counsel for respondent asked him to review respondent's clinical file and assist him in the defense of respondent's case, he would have to get permission to do so from his supervisor, but he did not know if he would be prevented from so assisting counsel. Counsel for respondent asked that the record reflect that respondent took issue as to the impartiality and independence of Dr. William Holz.

Respondent testified in his own behalf that he disagreed with the testimony of Drs. Cuneo and Holz that he posed a danger to others, stating, "I have been deprived of my freedom from the institution and they perpetuate their continual ideologies, period." Respondent admitted that he had the picture Dr. Holz showed at trial in his room and that he had gotten that picture from a magazine. Respondent noted that he had stated at a former hearing that he was "into drawing," that he had drawn seven other drawings of girls, about one per month, and that he was trying to increase his artistic ability dealing with that subject matter. He felt that it was not fair to show this picture in isolation because they did not show the other six or seven pictures which would show how his artistic ability had increased.

Respondent also stated that he had pasted a picture of a naked little girl on the envelope to his attorney because he had wanted a copy of the transcript from a former trial and the appellate court and Randolph County Court had refused to send him one. He testified that he stuck the picture on the envelope of the request to his attorney "so that it would get immediate attention."

Respondent also explained the letter he had written to DCFS:

"I wrote that because they've categorized me where if I was to leave this court right now I could not go out and find a wife and have a decent family or nothing because they have already categorized me as being mentally ill, mentally disturbed, incapable of handling life and I'm trying to break through all of that menagerie of garbage."

Respondent stated that the only attempt at treating his condition has been to give him "heavy sedated medications." He stated: "[The medication] allows you to lay in you bed and urinate on yourself, barely be able to feed yourself; you cannot think, you cannot go to school, you cannot participate in nothing; I know exactly what they wish to do to me plus sterilize you as far as sexuality; this is the extent of their ideology of treatment." Respondent denied that he was mentally ill, stating "I did six years and four months in prison on the felony charge and have since been in the Department of Mental Health being repunished for incidents which happened 12 years earlier."

Respondent testified that he was asking to be released from the Illinois Department of Mental Health and that if the jury found that he was not subject to commitment he would go back to West Frankfort and try to reestablish his life. Respondent admitted that he previously had wanted to marry his stepdaughter but stated that was no longer true. Respondent testified that he would call one of his relatives to come get him and start from there.

On cross-examination respondent stated that not all of the other seven drawings were of young naked girls; some were of women, people, or body structures. The reason he drew naked young females is because children are the most difficult thing to draw because of expression and body language. He draws them without clothing because "it captures the entire body instead of just part of it." He admitted that he was more interested in young naked girl children because he was in an all-male institution. He denied that he was a pedophile but admitted that he tried to treat himself for pedophilia for a long time.

Respondent also admitted on cross-examination that although he testified he was no longer interested in his stepdaughter, he had tried to contact her a few months earlier so that she could testify. He denied that he had previously been ordered not to have any contact with his stepdaughter. Respondent testified that he has a great deal of political association and that he has mental power through those organizations (the "Area and [sic] Brotherhood," the "Silent Brotherhood," the "Clan [sic]," and the "SLA which is the Patty Hurst [sic] case") to be able to have some effect on world events. Respondent denied that he felt responsible for what has recently happened in Russia, but

he stated that he used to write to President Reagan while he was in prison about this subject. He also professed to have an effect on natural disasters and plane crashes due to meditation and occult practice, and he believes that he can control people's minds.

Respondent testified on cross-examination that he has tried to cure himself through "decentralization," where you do something so many times that you get sick of it. He admitted that he has tried to deal with his problems with pictures of children, which he refused to label child pornography. He stated that he wanted to subpoena his drawings into court so as to distinguish between child pornography and "just pictures." Respondent feels that child pornography shows a direct violation of the child and this is wrong because it hurts people. Respondent denied that he has refused to cooperate in any treatment or counseling but feels that the only treatment the psychologists are interested in is psychotropic drugs. Respondent explained his statement that "Communism is the clinical psychologist" by stating that if mental health and clinical psychologists had all the answers then there would not be so much crime and corruption on the streets of society.

Respondent was asked if he had been molesting more than one child when he was convicted in 1980, and he responded that he had eight or nine in the house but the issue was not how many were there, "it is the idea that this particular female caused my case." Respondent denied that every time transfer was recommended he would write something. Respondent believes that because Holz did not have anything to file in his certificate for recommitment, he "shook down" respondent's room to find the pictures.

At the close of the evidence counsel for respondent made an *in camera* restatement of his earlier argument that Drs. Holz and Cuneo were not impartial and were not available to assist the defense, warranting the appointment of an independent psychologist. The court again noted that the *Pates* decision stands for the proposition that the fact an examiner is in the employ of the Department of Mental Health does not *per se* indicate that this person cannot be an independent examiner, and the court also noted that Dr. Cuneo was found in the *Pates* case to be an independent examiner.

The jury returned a verdict, after deliberating approximately 20 minutes, that respondent was subject to involuntary admission. The court entered judgment on the jury's findings and remanded respondent to the custody of the Department of Mental Health and Developmental Disabilities.

Respondent first argues that the denial of his request for an independent examination pursuant to section 3—804 requires reversal of the September 19, 1991, order entered on the jury's verdict. Section 3—804 of the Mental Health and Developmental Disabilities Code provides:

"The respondent is entitled to secure an independent examination by a physician, qualified examiner, clinical psychologist or other expert of his choice. If the respondent is unable to obtain an examination, he may request that the court order an examination to be made by an impartial medical expert pursuant to Supreme Court Rules or by a qualified examiner, clinical psychologist or other expert. Any such physician or other examiner, whether secured by the respondent or appointed by the court, may interview by telephone or in person any witnesses or other persons listed in the petition for involuntary admission. The physician or other examiner may submit to the court a report in which his findings are described in detail. Determination of the compensation of the physician, qualified examiner, clinical psychologist or other expert and its payment shall be governed by Supreme Court Rule." (Ill. Rev. Stat. 1991, ch. 91½, par. 3—804.)

As noted above, the trial court relied on *In re Pates* (1981), 99 Ill. App. 3d 847, 426 N.E.2d 275, in denying respondent's request for an independent examination by qualified examiner *not in the employ of the Department of Mental Health.* We found in *Pates* that section 3—804 of the Code does not exclude an expert employed by the State and that all that is required is that the examiner be impartial. Based on the facts contained in the record on appeal, we found in *Pates* that the respondent had been provided with an impartial psychologist by the appointment of Dr. Daniel J. Cuneo. We noted:

"Dr. Cuneo is not a partisan of the State, though his fee was paid by the State, any more than assigned counsel for the defense is beholden to the prosecution merely because he is compensated by the State. Each is given a purely professional job to do—counsel to represent the defendant to the best of his ability, the psychologist impartially to examine into and report upon the mental condition of the respondent.

The fact is that psychiatrists and psychologists are professional people, not advocates. Nevertheless, when they express views which are not in accord with those harbored by the confined patient or his counsel, there is a tendency to regard such an expert as an adversary or a partisan of the State. It is im-

proper to suggest that government psychiatrists or psychologists are not impartial in this context. [Citations.] A psychologist who expresses his professional opinion in court is not a partisan but is, in effect, the court's witness. [Citation.] All he need do is render his best judgment and make all relevant information available both to the court and the defense." (*Pates*, 99 Ill. App. 3d at 849-50, 426 N.E.2d at 277-78.)

We held in *Pates* that where there has been no challenge of the professional standing of the expert whose examination and report has been furnished at State expense and no question has been raised as to his competence, his impartiality, or the thoroughness of his examination of the respondent, there is no further obligation on the part of the State to supply defense counsel with funds to hire expert witnesses for the defense in order to offer an opinion that the respondent is not in need of involuntary admission and treatment by the Department of Mental Health. *Pates*, 99 Ill. App. 3d at 850, 426 N.E.2d at 278.

Respondent argues, however, that unlike the factual situation in the *Pates* case, where there was no challenge to the impartiality of Dr. Cuneo as a qualified independent examiner, respondent did object to the impartiality of Dr. Cuneo both at the hearing on respondent's motion to appoint an independent examiner and at trial. However, we also noted in *Pates* that there was no evidence in the record that Dr. Cuneo was not, in fact, impartial: he neither provided a certificate for respondent's involuntary admission nor helped prepare a plan of treatment, Dr. Cuneo was not a full-time employee of the Department, and the record indicated that little of his professional time was spent as an employee of the Department due to his private practice and teaching activities. On this basis we found in *Pates* that respondent had the benefit of an impartial psychologist.

Respondent would distinguish the instant case from *Pates* in that the petition involved in the *Pates* case was one for discharge filed by the involuntarily committed patient rather than a petition filed by the State for continued involuntary admission of the patient. Respondent argues that the petition for discharge was a determinative factor in the court's reasoning in *Pates* that section 3—804 requires a showing of impartiality. We must disagree.

We noted in *Pates* that section 3—804 provides for determination of the compensation to be paid to the qualified examiner and payment thereof to be governed by supreme court rules, but the legislature had not appropriated funds with which to implement the full utilization of that statute and, consequently, there was no supreme court rule ad-

dressing the statutory purpose. We also opined that it was unfair to impose upon Illinois counties in which Department of Mental Health facilities are located the cost of an expert described in the statute for every patient confined in such institution, considering the fact that petitions for discharge are filed by practically all patients with such repetition as the applicable statutes allow. We concluded by stating that the expense of providing funds to implement the rights granted by section 3—804 would wreak fiscal havoc in the subject counties and place a severe drain on the State itself.

■ First, section 3—804 of the Code applies with equal force to both petitions for discharge and petitions for involuntary admission. (See Ill. Rev. Stat. 1991, ch. 91½, par. 3—901(b).) Second, the above-stated concluding comments regarding payment of section 3—804 examiner fees were made in the *Pates* case following our finding that the respondent had received the benefit of an impartial psychologist and our holding that the judgment of the circuit court of Randolph County was affirmed. Accordingly, the comments could only be characterized as *obiter dicta* and would most properly be characterized as editorial comment for the benefit of the Illinois General Assembly. We must reiterate, however, that the basis for our holding in *Pates* was one of statutory construction, that section 3—804 merely requires an *impartial* examiner and that employees of the Department of Mental Health are not excluded by the statutory language from being considered as impartial medical experts.

Respondent also contends, however, that our decision in *Pates* has not been followed by other reviewing courts and should no longer be followed by this court, citing *In re Williams* (1985), 133 Ill. App. 3d 232, 478 N.E.2d 867 (*Williams I*); *In re Williams* (1986), 140 Ill. App. 3d 708, 489 N.E.2d 347 (*Williams II*); and *People v. Rotuno* (1987), 156 Ill. App. 3d 989, 510 N.E.2d 463. The reviewing court in *Williams II* reiterated its holding in *Williams I* that a respondent in a mental health hearing is entitled to an examination by an independent psychiatrist appointed by the court and paid for by the State pursuant to section 3—804 of the Code, and that the failure to provide for such examination is reversible error. *Williams II*, 140 Ill. App. 3d at 711, 489 N.E.2d at 349.

We initially note that respondent's argument is not supported by the *Rotuno* case, which involved a defendant who was found not guilty by reason of insanity and who was subsequently found subject to involuntary admission and placed in the custody of the Illinois Department of Mental Health and Developmental Disabilities. We recognized in the *Rotuno* case that section 3—804 of the Code is applicable

to section 5—2—4(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(a)), which deals with the evaluation required to determine if such defendants are subject to involuntary commitment. Accordingly, we held that the defendant had a right to secure an independent examination by an expert of her choice pursuant to section 3—804 and that the court erred in refusing to grant a continuance so that defendant could secure an independent psychiatric examination before proceeding with the section 5—2—4(a) hearing. We did not hold in *Rotuno* that the right to *secure* an independent examination by a chosen expert is equivalent to a statutory directive that the court order such examination to be paid for by the State.

As respondent points out, the reviewing court in *Williams I* criticized our decision in *Pates*, stating that we had engrafted upon section 3—804 of the Code the additional requirement that a respondent must first challenge the impartiality of the State's experts before he can claim his statutory right to an independent examination. (*Williams I*, 133 Ill. App. 3d at 236, 478 N.E.2d at 870.) Although the reviewing court in *Williams I* characterized the impartiality issue as a judicially enacted condition precedent, we again find that section 3—804 of the Code merely requires the State to provide respondent with an impartial medical expert upon request and does not exclude Department of Mental Health employees from being considered as impartial, under the above-stated reasoning set forth in our decision in *In re Pates*. While the expert appointed by the court may not be the examiner the respondent would have chosen, we do not read section 3—804 as mandating that the appointed examiner be chosen by the respondent.

We recently addressed the viability of our decision in *Pates* in *In re Barnard* (5th Dist. April 7, 1993), No. 5—92—0252 (unpublished order under Supreme Court Rule 23). In that case, which involves the same respondent and a petition for continued involuntary admission as in the instant case, we rejected the respondent's argument on appeal that section 3—804 mandates the court to order an examination by an examiner not employed by the Department of Mental Health, finding that this issue was resolved in *Pates*. As in the instant case, respondent raised an issue in case No. 5—92—0252 with the impartiality of Dr. Cuneo, and we found that the record reflected that counsel for respondent had made a full exploration of Dr. Cuneo's biases, but the record failed to indicate that Dr. Cuneo was not impartial. We also note, as the court noted in *Pates* and in case No. 5—92—0252, that Dr. Cuneo did not prepare a certificate for respondent's involuntary admission, nor did he help prepare respondent's plan of treatment,

and Dr. Cuneo is not employed on a full-time basis by the Department and is engaged in his own private practice and consulting work for other agencies. We also disagree with respondent's assertion that Dr. Cuneo's admission that he had opined that respondent had met the criteria for involuntary admission in previous hearings involving respondent conclusively proves that Dr. Cuneo is not impartial. We adopt the reasoning of our previous decision in *Pates* in holding that the trial court's denial of respondent's request for an impartial examination was proper.

■ Respondent also argued in case No. 5—92—0252, as he similarly argues in the instant case, that he was denied the effective assistance of counsel due to the fact that the trial court rejected his request for an independent examination by a person not employed by the Department of Mental Health because without access to an independent expert his counsel did not know the proper questions to ask the State's witness on cross-examination and so the outcome of the hearing would have been different. We rejected this argument in case No. 5—92—0252, finding that counsel for respondent made a full exploration of Dr. Cuneo's possible biases. The record similarly indicates in the instant case that counsel for respondent fully explored the impartiality issue in his cross-examination of Dr. Cuneo. Moreover, we reject respondent's contention that the frequency of Dr. Cuneo's opinion in favor of involuntary admission since 1984 conclusively proves that Dr. Cuneo is not impartial, for the reasons stated in the *Pates* decision.

We also note that counsel was effective in bringing out in cross-examination that some of respondent's recent letters were not so much threatening as they were "loose" and that Dr. Holz felt that respondent could be transferred to a less secure facility but was overruled by the administration. We therefore reject the contention that counsel was somehow ineffective because he did not know "the right questions to ask."

■ We also rejected respondent's argument in case No. 5—92—0252 that the outcome of the hearing would have been different if respondent had been furnished with an expert not employed by the Department of Mental Health. We noted in this case that respondent had denied that he had a mental or behavioral problem but admitted that he masturbated in his room to pictures of small children, some of which he personally drew. In the instant case, respondent similarly denies that he has pedophilia but admits that he is trying to cure his "problem" through masturbation, or as he refers to it, "decentralization." The record is also replete with evidence which supports the

conclusion of the State's witnesses that respondent was mentally ill and because of his mental illness could reasonably be expected to inflict serious physical harm upon himself or another in the near future. The flaw in respondent's speculative argument is that it presupposes that respondent would have been able to find an expert who would disagree with the learned opinions of Drs. Cuneo and Holz that respondent fits the criteria for civil commitment.

Finally, respondent maintains that the right to independent psychiatric opinion, as a necessary component of the rights to effective assistance of counsel, to present evidence, and to confront and cross-examine witnesses, has been widely recognized, citing *De Marcos v. Overholser* (D.C. Cir. 1943), 137 F.2d 698, *Dixon v. Attorney General* (M.D. Pa. 1971), 325 F. Supp. 966, *Proctor v. Harris* (D.C. Cir. 1969), 413 F.2d 383, *In re Gannon* (1973), 123 N.J. Super. 104, 301 A.2d 493, and ABA Commission on the Mentally Disabled, *Involuntary Civil Commitment: A Manual for Lawyers and Judges*, at 25 (1988). However persuasive this authority from other jurisdictions may be for the proposition that the respondent should be furnished at State expense with an expert of his or her own choosing, we find that section 3—804 of the Mental Health and Developmental Disabilities Code controls our disposition of this issue. As this statute was construed in the *Pates* case, we hold that Illinois law does not require the State to furnish respondent with an independent examiner not employed by the Department of Mental Health in order to ensure that respondent receives the effective assistance of counsel.

Respondent next argues that he was denied a fair trial by the introduction into evidence of an inflammatory and illegally seized drawing. We note that respondent's second issue on appeal is based on several assumptions. First, in spite of counsel's failure to object to the introduction into evidence of People's exhibit number 1, this issue is not waived on appeal because this court can consider the issue under a "plain error" doctrine. Second, the drawing was illegally seized in violation of respondent's rights under the fourth amendment to the United States Constitution. We must first address the legitimacy of these assumptions.

As noted above, counsel for respondent did not object to the introduction into evidence of People's exhibit number 1 and no post-trial motion was filed. As a general rule, issues not presented to or considered by the trial court cannot be raised for the first time on review. (*Yates v. Doctor's Associates, Inc.* (1990), 193 Ill. App. 3d 431, 442, 549 N.E.2d 1010, 1017.) This rule is subject to exceptions, however, and respondent urges that this court may address the issue of what

he characterizes as an illegal seizure under the plain error doctrine. Respondent asserts that this doctrine applies in the instant case because the search of his room where the drawing was located and the seizure of the drawing were made in violation of his fourth amendment right to protection against unreasonable search and seizure and so introduction of such illegally seized evidence affected substantial rights and denied respondent a fair trial.

Reviewing courts in involuntary-commitment cases have addressed issues raised for the first time on appeal under a doctrine analogous to plain error. (See *In re James* (1989), 191 Ill. App. 3d 352, 547 N.E.2d 759; *In re Satterlee* (1986), 148 Ill. App. 3d 84, 499 N.E.2d 101.) For example, in *James* the court applied this doctrine in order to consider respondent's argument that the decision to commit him was made with insufficient information because the facility director's report, which is required by section 3—810 of the Code for all commitment proceedings, was not presented to the trial court. The reviewing court found that because involuntary-commitment proceedings affect important liberty interests, the need for strict compliance with the statutes is essential. Accordingly, the court considered this alleged error for the first time on appeal, ruled that such error was not harmless, and held that such error warranted reversal of the trial court's judgment and a new trial for the respondent. (*James*, 191 Ill. App. 3d at 356-57, 547 N.E.2d at 762.) Similarly, reviewing courts have found under this doctrine that failure to strictly comply with the statutory time for filing a petition for involuntary admission (*In re Whittenberg* (1986), 143 Ill. App. 3d 836, 493 N.E.2d 662), failure to comply with the statutory notice procedures (*In re Franklin* (1989), 186 Ill. App. 3d 245, 541 N.E.2d 168), and failure to comply with the statutory requirements for the petition supporting commitment and its accompanying certificates (*In re Stone* (1989), 178 Ill. App. 3d 1084, 534 N.E.2d 213) may be addressed on appeal to reach an error apparent of record. In such cases it has been held that matters appearing of record which clearly demonstrate noncompliance with the relevant statutory provisions render the judgment entered in the cause erroneous and of no effect. *Satterlee*, 148 Ill. App. 3d at 86, 499 N.E.2d at 103.

■ In the instant case we have no allegation of an error apparent of record demonstrating noncompliance with any relevant statutory provisions such as would render the judgment entered erroneous and of no effect. Indeed, respondent is alleging a violation of his constitutional rights to invoke the plain error doctrine so that this court may address whether People's exhibit number 1 should have been subject

to the exclusionary rule. The plain error doctrine is set forth in Supreme Court Rule 615(a) and provides:

> "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (134 Ill. 2d R. 615(a).)

This rule, however, is applicable only to appeals in criminal cases, not to appeals involving civil matters such as the petition for involuntary admission. Moreover, a party claiming a violation of a constitutional right has a duty to raise the argument at the earliest opportunity, and the failure to do so constitutes a waiver of that right. (*In re Adoption of Kindgren* (1989), 184 Ill. App. 3d 661, 669, 540 N.E.2d 485, 490.) We find that the issue has been waived by respondent because there was no objection to the introduction of People's exhibit number 1 into evidence at trial or by way of a post-trial motion.

Respondent argues, however, that he was denied the effective assistance of counsel because of his trial counsel's failure to move to suppress respondent's drawing or to object to its admission. Respondent has a statutory right to counsel under section 3—805 of the Code (Ill. Rev. Stat. 1991, ch. 91½, par. 3—805), and the State concedes that respondent has a statutory right to effective assistance of counsel.

■ Respondent testified, however, that he had "subpoenaed [his] stuff in court before this hearing" because he wanted to "distinguish the difference between child pornography and just pictures." Dr. Holz also testified that respondent told him he wanted to bring this picture to court because it proved that he and Dr. Cuneo were liars, presumably because People's exhibit number 1 and the other drawings would show that respondent had some artistic ability. As the State notes, respondent's counsel not only failed to object to the introduction into evidence of People's exhibit number 1, he also pursued the issue by questioning the respondent about that drawing and others which he had done, as a matter of tactics, to show that respondent's drawings were not exclusively of young nude girls and to allow the respondent to explain why he drew the human body.

Appellate review of a trial counsel's competency in mental health cases does not extend to areas involving the exercise of judgment, discretion, or trial strategy. (*In re Peterson* (1983), 113 Ill. App. 3d 77, 81, 446 N.E.2d 565, 568.) We also note that the drawing was not the sole evidence supporting the jury's verdict that respondent was subject to continued involuntary admission. Accordingly, we reject re-

spondent's claim that he was denied the statutory right to effective assistance of counsel in this regard.

Lastly, respondent contends that the State failed to present clear and convincing evidence that he was subject to continued involuntary admission. Section 1—119(1) of the Code provides that a person is subject to involuntary admission if he is mentally ill and, because of his mental illness, is reasonably expected to inflict serious harm upon himself or another. (Ill. Rev. Stat. 1991, ch. 91½, par. 1—119(1).) In a proceeding on a petition for involuntary admission, the State is required to prove the necessary allegations of the petition by clear and convincing evidence, and the factual basis for the medical opinion upon which the decision to commit is based must be judged by a similar standard. (*In re James* (1989), 191 Ill. App. 3d 352, 354-55, 547 N.E.2d 759, 760.) Mental illness alone does not justify involuntary commitment; the State must present explicit medical testimony that respondent, because of his illness, poses a serious danger to himself or another. (*James*, 191 Ill. App. 3d at 355, 547 N.E.2d at 760-61.) A recommendation of involuntary hospitalization requires a current condition of mental illness and future likelihood of harm, not mere reliance on historical facts. *In re Orr* (1988), 176 Ill. App. 3d 498, 505-06, 531 N.E.2d 64, 69.

Respondent argues that the State did not present a case consistent with these requirements and so the jury's verdict could not have been properly supported and must have had as its basis prejudice and irrational fear. In support of this argument, respondent cites the inflammatory physical evidence, People's exhibit 1, which went with the jury into deliberation, and the testimony of two experts for the State and asserts he was forced to present his case with only personal testimony. Respondent particularly notes that while the State may have demonstrated mental illness, it failed to prove the element of demonstrated dangerousness or that dangerousness resulted from respondent's mental illness. Respondent maintains that the State relied on innuendo, through reference to Satanism, magazines, letters, and other materials that were never introduced at trial, in order to bolster its case that respondent was dangerous to others, and he argues that the State had to rely primarily on an incident which occurred in 1979, for which respondent was convicted, in order to prove dangerousness. Respondent urges that the current treatment plan for respondent, which was filed with the petition for involuntary admission, reveals that, while respondent receives no psychotropic medication, he takes medication ordered for acute anxiety without problems and during the current period required no PRN medication, seclusion, or restraints for

inappropriate behavior and had interacted with staff and peers well. Moreover, the psychiatric assessment revealed that he denied hearing voices and had not been depressed, suicidal, or homicidal. Respondent notes that the plan also indicated a long-term goal of transfer to an open hospital by February 1, 1992. Respondent also urges that there was never a nexus of timeliness established between the doctors' perception of respondent and any real or projected dangerousness.

■ Prediction of future dangerousness is inexact, however, and commitment will be upheld where there is a reasonable expectation that respondent will engage in dangerous conduct within the meaning of the Code. (*James*, 191 Ill. App. 3d at 355, 547 N.E.2d at 761.) In the instant case Dr. Cuneo testified that respondent is suffering from a mental illness, pedophilia, and has other personality disorders which affect his insight, judgment, and ability to appropriately relate to other people. Dr. Cuneo opined that respondent was a danger to himself and others because of this impaired judgment. Dr. Cuneo emphasized that respondent was not being hospitalized for pedophilia but because he was a danger to himself and others because of his behavior. Dr. Cuneo could not even recommend transfer to a less secure facility at this time because of respondent's failure to cooperate in psychotherapy and medication treatment. In Dr. Cuneo's opinion, because of respondent's untreated pedophilia and his desire to return to the town where he was convicted of sexually abusing a child, respondent reasonably could be expected to inflict serious harm upon himself or another in the near future. Although Dr. Holz concurred with the opinion of the master treatment plan that respondent could be transferred to a less secure facility, he reiterated that this did not negate a conclusion that respondent met the criteria for involuntary admission to a mental health facility. Moreover, Dr. Holz concurred in Dr. Cuneo's assessment that respondent refuses to avail himself of the opportunity for psychotherapy to treat his mental illness and that his personality disorders affect respondent's thought processes, perceptions, and judgment.

Respondent's testimony denying that he suffers from pedophilia is belied by the drawing with which he "treated" himself by masturbation. The explicit detail of the genitalia on this drawing of a female child, together with respondent's testimony indicating a preoccupation with naked female children and an inability to recognize that he has a problem in this regard, corroborates the assessment of Drs. Cuneo and Holz that respondent's impaired judgment and inability to control his behavior still causes respondent to be a danger to himself and others. Moreover, respondent's explanations for the recent threatening

letter to the Superintendent of Parole and the drawing placed on the envelope of the letter to his attorney support Dr. Cuneo's assessment that respondent's impaired judgment causes respondent to be dangerous to himself.

Although respondent cites numerous out-of-court documents and materials upon which Dr. Cuneo's opinion of dangerousness was based, we note that Dr. Cuneo also testified that these documents were part of his file on respondent's case. It is proper for an expert to examine the respondent's complete psychiatric history to form an opinion as to the respondent's then-current and future dangerousness. (*Orr*, 176 Ill. App. 3d at 506, 531 N.E.2d at 70.) We also note that an expert may utilize otherwise inadmissible reports prepared by others in forming his opinion if the facts or data are of a type reasonably relied upon by experts in the particular field. (*People v. Lang* (1986), 113 Ill. 2d 407, 464, 498 N.E.2d 1105, 1131.) Contrary to respondent's assertion that there was no nexus between these documents and the assessment of current dangerousness, we note that the altering of the Newsweek advertisement, the drawing of the naked female child, the pasting of the picture of the naked little girl on the envelope of the letter to his attorney, the refusal to pay for mail-order materials as reported by the staff of the Center, and the threatening letter to the Superintendent of Parole were all testified to have occurred very close in time to the September 1991 trial. Moreover, while there was no current psychiatric evaluation of respondent by Drs. Cuneo and Holz prior to trial, making it more difficult for the doctors to arrive at an opinion, this does not invalidate the opinion. See *In re Pritchett* (1986), 148 Ill. App. 3d 746, 750, 499 N.E.2d 1029, 1032.

We find that the doctors' assessment that there was a reasonable expectation the respondent might engage in dangerous conduct if he were to be released and their medical opinions that respondent met the criteria for involuntary admission were supported by clear and convincing evidence. We further find that the State proved by clear and convincing evidence that respondent was subject to continued involuntary admission.

For the foregoing reasons, the September 19, 1991, order of commitment by the circuit court of Randolph County is affirmed.

Affirmed.

GOLDENHERSH and RARICK, JJ., concur.